**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Geronimo MUNIZ–MELCHOR,
Defendant–Appellant.**

**No. 89–1178.**

United States Court of Appeals,
Fifth Circuit.

Feb. 12, 1990.

---

Thomas S. Morgan, Midland, Tex., (court appointed), for defendant-appellant.

Theodore R. Mitchell, Charles K. Novo-Gradac, White, Novo-Gradac, & Thompson, Saipan, Cmwlth. of Northern Mariana Islands, for plaintiffs-appellees.

Before GOLDBERG, GARWOOD and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Geronimo Muniz–Melchor (Muniz–Melchor) appeals his conviction of possession of marihuana with intent to distribute it in violation of 21 U.S.C. § 841(a)(1). Muniz–Melchor contends that the district erred in not suppressing the marihuana removed from a tank mounted in the bed of his truck as fruit of an illegal search under the Fourth Amendment. We affirm.

### Facts and Proceedings Below

At approximately 6:15 p.m. on April 12, 1987, Muniz–Melchor approached a tempo-

rary fixed checkpoint of the United States Border Patrol on Highway 385 approximately five miles south of Marathon, Texas, and seventy miles north of the U.S.–Mexican border. A "slow" sign appeared about a quarter of a mile south of the checkpoint, followed shortly thereafter by a "stop" sign, traffic cones, and flashers leading travelers into the primary inspection area. The checkpoint itself consisted of a Suburban and two Border Patrol sedans, which were used as pursuit vehicles. Three Border Patrol agents, all of whom were in uniform and apparently armed, manned the checkpoint for seven days, pursuant to the orders of their field operations supervisor. (April 12 was the fifth day in which the checkpoint operated.) The agents stopped most traffic traveling north on U.S. Highway 385 in order to inquire as to the immigration status of such travelers.

Complying with the signal of Border Patrol agent Johnny Gutierrez (Gutierrez), who was also an agent of the U.S. Customs and Immigration Department (the Customs Department), Muniz–Melchor stopped his black Ford pickup truck at the checkpoint. According to Gutierrez's testimony at Muniz–Melchor's trial, Gutierrez identified himself and asked Muniz–Melchor to identify himself, and Muniz–Melchor complied with this request.[1] Gutierrez then asked Muniz–Melchor if he was coming from Mexico, and Muniz–Melchor responded that he had been visiting his parents in Mexico for three days. Gutierrez asked Muniz–Melchor for proof of his immigration status, and Muniz–Melchor produced valid documentation. Gutierrez then noticed that Muniz–Melchor did not appear to have any luggage or extra clothing or the like with him.

Having been trained in tank concealment by the Customs Department, Gutierrez also took special notice of a propane tank mounted in the open bed of Muniz–Mel-

chor's truck. The tank had at least a fifty-five gallon capacity. It was mounted immediately behind the cab of the truck and spanned the width of and rose above the sides of the bed of the truck.[2] Gutierrez tapped the side of the tank with his pocket knife, as he habitually did to all such tanks. According to Gutierrez, the tank did not yield the bell-like ring of a tank whose exterior has not been penetrated in some manner. Gutierrez also noticed scratch marks on the side of the tank, indicating to Gutierrez that the tank may have been laid down on its side.[3]

According to Gutierrez, only a few minutes after Muniz–Melchor's initial stop, he asked Muniz–Melchor for his permission to inspect the truck and to move the truck to the secondary inspection area, and Muniz–Melchor agreed to these requests. In response to defense counsel's query on direct examination as to whether Muniz–Melchor consented to the search of his truck by Gutierrez, Muniz–Melchor responded, "No. Only as they search everyone, just around like that. Not so they would open everything and stuff." Before Muniz–Melchor's truck was moved to the secondary area, Gutierrez noticed that, although the bed and the underside of the truck were dirty, the bolts securing the tank to the bed of the truck were clean, indicating to Gutierrez that the tank had been recently removed. Gutierrez then asked Muniz–Melchor whether the tank had been removed, and Muniz–Melchor responded that the tank had not been removed since its installation two years earlier.

At the secondary area, Gutierrez examined the truck more closely. According to Gutierrez, the fuel gauge on the tank appeared to be stuck at fifty-five gallons because it would not move when the truck was rocked. Gutierrez testified that he had seen similar faulty gauges on other propane tanks with false compartments.

---

**1.** Because Muniz–Melchor could not speak English, he and the bilingual Gutierrez communicated in Spanish.

**2.** The district court admitted as evidence three pictures of the tank, two of which showed the tank in the bed of Muniz–Melchor's truck.

**3.** It is unclear from the record below whether Gutierrez noticed the scratches before, simultaneous with, or just after his tapping on the side of the tank.

After Gutierrez consulted with the other Border Patrol agents at the checkpoint, one of the agents called the U.S. Drug Enforcement Administration (DEA) for assistance. According to Gutierrez, he informed Muniz–Melchor of this fact, and Muniz–Melchor responded that, if there was something in there, the agents must prove it, but that there was nothing in there.

The DEA agents arrived approximately thirty to forty-five minutes later and were apprised of the developments up to that point. According to DEA special agent Tom Kelly (Kelly), he then asked Muniz–Melchor, through Gutierrez as an interpreter, whether Muniz–Melchor had any problems with Kelly's further inspection of the truck, and Muniz–Melchor agreed to his request. After noting the scratches and clean bolts of the tank, the DEA agents moved the truck away from the secondary inspection area for safety purposes in order to vent the propane from the tank. The agents then removed the tank from the bed of the truck. Kelly discovered a false compartment inside the tank, containing approximately one hundred pounds of marihuana wrapped in cellophane. The agents then arrested Muniz–Melchor, at approximately 8:30 p.m.[4] According to Gutierrez, as he read Muniz–Melchor his *Miranda* rights, Muniz–Melchor exclaimed, "They put it in there."

Muniz–Melchor was indicted of possession of marihuana with intent to distribute it in violation of 21 U.S.C. § 841(a)(1). He filed a pretrial motion to suppress the marihuana removed from the tank as fruit of an illegal search under the Fourth Amendment. Waiving his right to a jury trial, Muniz–Melchor consented to the district court's conducting a joint suppression hearing and bench trial. The district court denied Muniz–Melchor's suppression motion and convicted him of the offense as charged. The court found that Gutierrez's tapping on the tank was an unobtrusive action not amounting to a search under the Fourth Amendment. The court also found that Muniz–Melchor voluntarily consented

to the subsequent searches by both Gutierrez and Kelly and, further, that the agents had probable cause to believe Muniz–Melchor was trafficking in contraband before he purportedly consented to Kelly's further search of the truck. The district court sentenced Muniz–Melchor to three years' imprisonment, two years' supervised release, and a fifty dollar special assessment. This appeal followed.

## Discussion

■ Muniz–Melchor first challenges the district court's determination that Gutierrez's tapping on the side of the propane tank did not constitute a search under the Fourth Amendment. This is an issue of first impression. *Cf. United States v. Coburn,* 876 F.2d 372, 373 (5th Cir.1989) (agent tapped on gas tank mounted in bed of defendant's truck but after agent received defendant's consent to inspect truck).

Muniz–Melchor essentially contends that, because Gutierrez's tapping—for which there was neither a warrant, probable cause, nor express consent—tainted the subsequent searches by Gutierrez and Kelly, the district court should have suppressed the marihuana seized from the tank. *Cf. United States v. Miller,* 821 F.2d 546, 549–50 (11th Cir.1987) (stop of defendant's car without reasonable suspicion tainted defendant's subsequent consent to car's search). Muniz–Melchor's contention obviously is premised on the assumption that the tapping constituted a search under the Fourth Amendment. The district court, however, specifically found the tapping to be an unobtrusive action not constituting a search under the Fourth Amendment. While we review questions of law *de novo,*

"[i]n reviewing a trial court's ruling on a motion to suppress based on live testimony at a suppression hearing, the trial court's purely factual findings must be accepted unless clearly erroneous, or influenced by an incorrect view of the law, and the evidence must be viewed most

---

4. There was some discrepancy as to the time. Muniz–Melchor testified that he was detained

for as much as four-and-a-half hours before he was arrested.

favorable to the party prevailing below...." *United States v. Maldonado*, 735 F.2d 809, 814 (5th Cir.1984).

Under the Fourth Amendment, there are "two analytically distinct yet 'inevitably intertwined'" issues: (1) whether the disputed investigative procedure invaded a privacy interest of the defendant protected under the Fourth Amendment; and (2) whether that invasion was reasonable under the circumstances. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 2565, 65 L.Ed.2d 633 (1980) (Blackmun, J., concurring) (citation omitted), *quoted in United States v. Parks*, 684 F.2d 1078, 1083 (5th Cir.1982). Thus, the threshold issue is whether Gutierrez's tapping on the tank invaded a privacy interest of Muniz–Melchor protected under the Fourth Amendment.

In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the United States Supreme Court rejected the notion that what constitutes a trespass under various property laws *necessarily* constitutes a search under the Fourth Amendment. *See Katz*, 88 S.Ct. at 511–12 ("the Fourth Amendment protects people, not places"). In light of its analysis in *Katz*, the Supreme Court instead has adopted a reasonable or legitimate expectation of privacy test.[5] *See, e.g., California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30 (1988) (reasonable); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 430–33, 58 L.Ed.2d 387 (1978) (legitimate); *Katz*, 88 S.Ct. at 516–17 (Harlan, J., concurring) (reasonable). For example, one generally does not have a reasonable expectation of privacy with respect to items that are in the plain view of a law enforcement officer, such as the exterior of a vehicle.[6] *See New York v. Class*, 475 U.S. 106, 106 S.Ct. 960, 965–66, 89 L.Ed.2d 81 (1986) ("The [vehicle identification number's] mandated visibility makes it more similar to the exterior of the car than to the trunk or glove compartment. The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.'"); *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 2470, 41 L.Ed.2d 325 (1974) (plurality) ("With the 'search' limited to the examination of the tire on the wheel and the taking of paint scrapings from the exterior of the vehicle left in the parking lot, we fail to comprehend what expectation of privacy was infringed.") (footnote omitted). *See generally* 1 W. LaFave, *Search and Seizure*, § 2.5(b) (1987 & Supp.1989).

The evidence reflected that the purpose of Gutierrez's tapping on the side of the tank was to determine the structural integrity of its exterior—*i.e.*, whether the tank's exterior had been penetrated in some manner. Gutierrez testified that an unpenetrated tank should emit a bell-like ring, regardless of the amount of propane in the tank. Thus, the tapping was not calculated to indicate the contents, as such, of the tank, but merely whether, regardless of the tank's present contents, its wall had previously been penetrated. *Cf. White*, 766 F.2d at 1331–32 & n. 3 (not deciding whether a Border Patrol agent's pushing down on the trunk of an automobile, to determine whether the trunk contained heavy objects and thus whether to further inspect the

---

**5.** Because the threshold Fourth Amendment inquiry concerning what constitutes a search is largely couched in terms of the defendant's reasonable privacy expectations, this inquiry is intertwined with the further inquiry as to the reasonableness of the search. *See United States v. White*, 766 F.2d 1328, 1331 (9th Cir.1985) (noting that the Ninth Circuit has "been unable to define a bright line between 'no search' and 'search but not unreasonable'").

**6.** This Court has not expressly resolved issues relating to whether a law enforcement officer's physical contact with the exterior of a vehicle constitutes a search under the Fourth Amendment. For example, this Court has not specifically addressed whether installation of "beep-

ers" on the exterior of a vehicle constitutes a search. *See, e.g., United States v. Michael*, 645 F.2d 252, 256 & n. 11, 256 n. 14 (5th Cir.) (en banc) (assuming that attachment of a beeper to the exterior of a van constituted a search, contrary to the expressed view of seven concurring judges, and finding that such a minimal intrusion was justified in light of agents' reasonable suspicion that defendant was engaged in criminal activity), *cert. denied*, 454 U.S. 950, 102 S.Ct. 489, 70 L.Ed.2d 257 (1981); *United States v. Holmes*, 537 F.2d 227, 227–28 (5th Cir.1976) (en banc) (dividing equally as to whether attachment of a beeper to the right rear wheel of defendant's van constituted a search).

trunk to determine if those objects were illegal aliens, was a search, as in any event the minimal intrusion of pushing the trunk down was reasonable under the circumstances).

The government persuasively argues that, even if the purpose of the tapping were to reveal the nature of the tank's contents, this Court's opinion in *United States v. Lovell,* 849 F.2d 910 (5th Cir. 1988), suggests that the tapping would not constitute a search. In *Lovell,* this Court held that Border Patrol agents' removal of the defendants' luggage after it had been checked at the airline ticket counter, their compression of the sides of the luggage to force air out of them, and their sniffing of that air to determine whether the luggage contained contraband did not constitute a search under the Fourth Amendment. *See id.* at 913 (citing with approval *United States v. Viera,* 644 F.2d 509, 510–11 (5th Cir.) (" '[S]ome investigative procedures designed to obtain incriminating evidence from the person are such minor intrusions upon privacy and integrity that they are not generally considered searches or seizures subject to the safeguards of the fourth amendment.' ") (citation omitted), *cert. denied,* 454 U.S. 867, 102 S.Ct. 332, 70 L.Ed.2d 169 (1981)). The Court in *Lovell* reasoned that the defendant "had no reasonable expectation of privacy that his luggage would not be moved or handled. His reasonable expectation of privacy with respect to his luggage—that the contents would not be exposed to view—was not compromised by the agents' actions." *Id.* at 915.

In the present case, Muniz–Melchor had a reasonable expectation that the contents of the tank would not be exposed to public view. As discussed earlier, by tapping the side of the tank, Gutierrez at best determined whether further inspection of the tank were necessary to ascertain the nature of its contents. Gutierrez's tapping did not expose its contents, certainly less so than the agents in *Lovell* exposed that of the defendant's luggage by compressing its sides.

The investigative procedures in *Lovell* can be somewhat factually distinguished from those in the present case because a person who entrusts luggage to an airline obviously does so with the knowledge that the luggage will be handled—even handled roughly—by others. The weight of this distinction, however, is diminished by the widely accepted notion that the expectations of privacy in the contents of personal baggage, such as that of the defendant in *Lovell,* are substantially greater than the privacy expectations in an on-the-road automobile, such as that of the defendant in the present case. *See United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977); *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976); *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974).

The tank mounted in the open bed of Muniz–Melchor's pickup truck could hold as much as fifty-five gallons of propane. It spanned the width of and rose several inches above the top of the sides of the truck's bed. The tank was a part of the exposed exterior of the truck. Although Gutierrez's tapping on the side of the tank may have constituted a technical trespass, which is a relevant factor in determining whether the tapping constituted a search, *see Parks,* 684 F.2d at 1085, the tapping did not constitute a meaningful invasion of Muniz–Melchor's property rights. Nor did it constitute an invasion of Muniz–Melchor's reasonable or legitimate expectations of privacy. Surely Muniz–Melchor must have reasonably expected that someone, such as a gasoline station attendant, might lean against the tank or touch it in some manner. Likewise, it cannot be said that Muniz–Melchor could reasonably expect that no one might tap the tank. Thus, we conclude that the district court did not err in determining that Gutierrez's tapping on the side of the tank did not constitute a search under the Fourth Amendment.

At first glance, the Supreme Court's opinion in *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), may seem to suggest a different result. In *Hicks,* a police officer, who had lawfully

entered the defendant's apartment because a bullet had been shot through its floor, noticed some expensive stereo equipment inside the apartment. Suspecting that the equipment was stolen, the officer moved some of the components in order to read and record their serial numbers, some of which matched the numbers of stolen stereo equipment. The Court held that the officer's moving of the stereo equipment constituted a search. *See id.* 107 S.Ct. at 1152. The Court reasoned that "taking action, unrelated to the objectives of the authorized intrusion, which *exposed to view concealed portions* of the apartment or its contents, *did produce a new invasion of* respondent's *privacy* ...." *Id.* (emphasis added). Thus, the Court's opinion in *Hicks* arguably suggests that even the slight touching of an object by a law enforcement officer, such as Gutierrez's tapping on the side of the truck bed tank, constitutes a search under the Fourth Amendment.

*Hicks*, however, is properly distinguished from the present case on both on an abstract and a practical level. First, as above noted, it is widely accepted that one generally has a substantially greater expectation of privacy in his home and its contents than in his automobile. Thus, on an abstract level, the defendant in *Hicks* had a much greater expectation of privacy in the stereo equipment in his apartment than Muniz–Melchor had in the propane tank mounted in the open bed of his truck. *See Lovell*, 849 F.2d at 915 (distinguishing *Hicks* because "the physical intrusion, while limited, occurred in the defendant's apartment where he clearly had a legitimate expectation of privacy").

Second, the Court in *Hicks* emphasized that, by moving some of the stereo equipment in order to view its serial numbers, the officer was revealing something that previously had been left concealed by the defendant.[7] When a person has concealed something—*e.g.*, by placing a note face down on a desk so that the writing on it is not revealed—often that person implicitly

is communicating to others that they should not be "nosy" and examine what has been concealed. In many circumstances, the fact of concealment itself suggests at least a slight expectation of privacy in what is concealed. Thus, on a practical level, the defendant in *Hicks* could be characterized as having concealed that which was behind or underneath his stereo equipment in his residence and, therefore, as having reasonably expected that someone would not move that equipment to reveal what was concealed. On the other hand, it seems more difficult to say that Muniz–Melchor, by mounting this large propane tank in the open bed of his pickup truck, reasonably expected that no one would tap the side of the exposed tank. *See Lovell*, 849 F.2d at 915 (distinguishing *Hicks* because the police officer in *Hicks* clearly invaded the defendant's privacy expectation that "items which could conceivably have been hidden under the stereo would stay hidden"). In sum, *Hicks* does not compel this Court to characterize Gutierrez's tapping on the side of the tank as a search.

■ Muniz–Melchor raises another issue on appeal that is closely intertwined with the foregoing issue as to whether the tapping constituted a search. Citing *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), Muniz–Melchor argues that the purpose of the temporary checkpoint was to detect illegal aliens, that such aliens obviously could not have been inside the tank, and, therefore, that Gutierrez exercised unbridled discretion by tapping the tank in violation of the Fourth Amendment. The government does not dispute that the primary purpose of the checkpoint was to detect illegal aliens. Indeed, Muniz–Melchor does not seem to contest the validity of stopping vehicles at a temporary fixed checkpoint for such a limited purpose. *See United States v. Venegas–Sapien*, 762 F.2d 417, 418–19 (5th Cir. 1985). *See also Prouse*, 99 S.Ct. at 1401 &

---

**7.** The Court in *Hicks* stated, "It matters not that the search uncovered nothing of any great personal value to the respondent—serial numbers rather than (what might conceivably have been hidden behind or under the equipment) letters or photographs. A search is a search, even if it happens to disclose nothing but the bottom of a turntable." *Hicks*, 107 S.Ct. at 1152–53.

n. 26 (narrowly holding that, without reasonable suspicion, law enforcement officers cannot randomly stop a motorist for a driver's license and registration check and specifically noting that "[t]his holding does not preclude … spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion"); *United States v. McFayden*, 865 F.2d 1306, 1310–13 (D.C.Cir.1989) (citing *Venegas–Sapien* in support of its upholding the validity of a roadblock conducted in a systematic manner for the principal purpose of traffic enforcement in connection with a police program to curb drug trafficking). Moreover, it appears that the tank may have been large enough to hold a person—albeit a small one—and could have had air holes that were not readily apparent. *Cf. United States v. Jackson*, 825 F.2d 853, 865 (5th Cir.1987) (en banc) (dictum) (discussing the constitutionality of roving or fixed checkpoint searches of automobiles near border areas pursuant to "area warrants" and stating that "when the only government interest asserted is illegal immigration, the scope of border area searches must be limited to compartments large enough to secrete a person"), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 661 *and* 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988). Moreover, the government points out that the Border Patrol agents at the checkpoint, such as Gutierrez, were also authorized to enforce the laws regarding controlled substances in Title 21 of the U.S.Code. Gutierrez so testified at trial. We conclude that the stop in the present case was a legitimate one to enforce federal immigration laws and was not shown to be a mere subterfuge for enforcement of federal narcotics laws. *See United States v. Lopez*, 777 F.2d 543, 547 (10th Cir.1985) ("[t]he law does not require the police to ignore evidence of other crimes in conducting legitimate roadblocks. . . ."), *quoted in McFayden*, 865 F.2d at 1312.

Having determined that the district court did not err in finding that the tapping was not a search and, therefore, did not taint the subsequent warrantless searches of Muniz–Melchor's truck by Gutierrez and Kelly, we must next address whether these subsequent intrusions on Muniz–Melchor's privacy interests were reasonable under the Fourth Amendment. It is clear that any warrantless search at such a fixed immigration checkpoint is reasonable

> "only if based upon probable cause or consent. Consent and probable cause are alternative grounds justifying warrantless vehicle searches. If either ground existed prior to the search, the search was valid and proof of the other ground is not required." *United States v. Sutton*, 850 F.2d 1083, 1085 (5th Cir. 1988) (citations omitted).

The district court found that Muniz–Melchor separately consented to the searches by both Gutierrez and Kelly. The court also found that, prior to Kelly's drainage and removal of the tank revealing the false compartment containing the marihuana, the agents had probable cause to search the truck in light of the totality of the circumstances. *See Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (endorsing a totality-of-the-circumstances analysis for probable cause determinations with respect to warrant-based searches); *United States v. Mendoza*, 722 F.2d 96, 100 & n. 5 (5th Cir.1983) (applying the totality analysis in *Gates* to probable cause determinations with respect to warrantless searches).

Muniz–Melchor informed Gutierrez that he had been in Mexico visiting his parents for three days, but Gutierrez did not see any luggage, clothes, or similar items in the cab or bed of the truck. Moreover, Gutierrez noticed a number of discrepancies with respect to the tank indicating that it may have been removed in order to place contraband inside. As discussed earlier, Gutierrez, who had been trained by the Customs Department in tank concealment, tapped on the side of the tank, but the tank did not emit a bell-like ring, indicating that its exterior had been penetrated in some manner. Gutierrez testified that "[w]henever the metal has been … cut with a torch or cut with a hacksaw, or … has been passed through with a foreign object, … this bell-like quality ceases to exist." Gutierrez noticed scratches on the side of

the tank, indicating that the tank may have been laid on its side. He also noticed that the bolts, which secured the tank to the truck, were clean in contrast with the dirty bed and underside of the truck, indicating that the tank had been recently removed from the truck. However, Muniz–Melchor informed Gutierrez that the tank had not been removed since it was mounted on the truck two years earlier. Gutierrez also noticed that the tank's fuel gauge read that it contained fifty-five gallons of propane even when the truck was rocked, indicating that the gauge was mechanically stuck or had been tampered with in some manner. Gutierrez testified that he had seen similar malfunctioning gauges on other propane tanks containing false compartments.

■ A probable cause determination involves " 'a practical, common-sense decision whether ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *United States v. Cisneros–Mireles*, 739 F.2d 1000, 1003 (5th Cir.1984) (involving a warrantless automobile search) (quoting *Gates*, 103 S.Ct. at 2332 (citations omitted)). Probable cause requires substantially less evidence than that sufficient to support a conviction —*i.e.*, proof beyond a reasonable doubt— but more than " 'bare suspicion.' " *United States v. Raborn*, 872 F.2d 589, 593 (5th Cir.1989) (quoting *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949)).[8] The evidence presented in support of such a determination must be viewed in light of the observations, knowledge, and training of the law enforcement officers involved in the warrantless search. *See United States v. Reed*, 882 F.2d 147, 149 (5th Cir.1989); *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir.) (en banc), *cert. denied*, 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978). *See generally* 1 W. LaFave, *supra*, note 8, § 3.2(c). And, in making a probable cause determination, we have stated that the arresting (and, inferentially, the searching) officer is permitted to consider both the degree of the intrusion which the arrest (or search) will occasion and the law enforcement exigencies present in the particular situation. *See Raborn*, 872 F.2d at 593; *cf.* 1 W. LaFave, *supra*, note 8, § 3.2(e).

■ In isolation, no one of Gutierrez's observations with respect to Muniz–Melchor's truck and its contents or Muniz–Melchor's answers to Gutierrez's queries would constitute probable cause to search the truck and its tank. A succession of otherwise "innocent" circumstances or events, however, may constitute probable cause when viewed as a whole. We do not consider the several factors in isolation, but rather in their interrelated context, where each may reinforce the other, so that the laminated total may indeed be greater than the sum of its parts. *See United States v. Fooladi*, 703 F.2d 180, 184 (5th Cir.1983); *U.S. v. Sanchez*, 689 F.2d 508 at 514–16 & n. 10 (5th Cir.1982); 1 W. LaFave, *supra*, note 8, § 3.2(e), at 595 & nn. 168–69. View-

**8.** However, it is unclear whether the quantum of assurance required for probable cause may be more precisely fixed, or, if so, just where within this spectrum it lies. For example, although the Supreme Court in *Gates* also stated that "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," *Gates*, 103 S.Ct. at 2335 n. 13, the Court refused to more precisely specify the degree of assurance required. *See id.* at 2330.

This Court has indicated in dicta that a "more likely than not" standard (from the perspective of a reasonable officer) is applicable, *see United States v. Tinkle*, 655 F.2d 617, 622–23 (5th Cir. 1981), *cert. denied*, 455 U.S. 924, 102 S.Ct. 1285, 71 L.Ed.2d 467 (1982), as well as some level of assurance less than that, *see United States v. Antone*, 753 F.2d 1301, 1304 (5th Cir.), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52

*and* 474 U.S. 818, 106 S.Ct. 65, 88 L.Ed.2d 52 (1985); *United States v. Adcock*, 756 F.2d 346, 347 (5th Cir.), *cert. denied*, 471 U.S. 1102, 105 S.Ct. 2329, 85 L.Ed.2d 847 (1985). *Accord Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (plurality opinion) (probable cause "does not demand any showing that such a belief be correct or more likely true than false"); *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir.1987) (probable cause does not require proof "that it is more probable than not that a crime has been or is being committed"), *cert. denied*, 484 U.S. 1077, 108 S.Ct. 1056, 98 L.Ed.2d 1018 (1988). *See generally* 1 W. LaFave, *Search and Seizure* § 3.2(e) (2d ed. 1987 & Supp.1989) (discussing the degree of probability required for a probable cause determination). Under the facts of this case, it is not necessary for us to elect between these rather abstract standards within the more general *Gates* criteria.

ing the overall context of the events and the totality of the evidence presented, including Gutierrez's training and prior experience with respect to tank concealment, most favorably to the government, which prevailed below, *see Reed,* 882 F.2d at 149, we conclude that, although the issue is certainly a close one, the record adequately supports the district court's determination that the agents had probable cause to search the truck and its tank prior to the search performed by Kelly.[9] Thus, it is unnecessary for this Court to address the question as to whether the district court properly found that Muniz–Melchor consented to Kelly's search. *See Sutton,* 850 F.2d at 1085.

■ The only question left for this Court to resolve is whether the district court properly found that Muniz–Melchor consented to Gutierrez's prior inspection of the tank. The government has the burden of proving voluntary consent by clear and convincing evidence. *See United States v. Gonzales,* 842 F.2d 748, 754 (5th Cir.1988).

"A trial court's finding of consent will not be overturned unless clearly erroneous. Consent to search must be given knowingly and voluntarily under the 'totality of the circumstances.' We have outlined six primary factors to consider in making this determination: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedure; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the

defendant's belief that no incriminating evidence will be found. All of these factors are relevant, but none of the six is dispositive." *United States v. Tedford,* 875 F.2d 446, 451–52 (5th Cir.1989) (citations omitted).

■ With respect to the voluntariness of Muniz–Melchor's custodial status, he contends that he was not free to leave the checkpoint and, therefore, effectively was being held in custody. The government responds that the fact that Muniz–Melchor may have been "seized" for Fourth Amendment purposes at the checkpoint does not render Muniz–Melchor as being held in official custody. *See Gonzales,* 842 F.2d at 755. Discussing the lawfulness of fixed checkpoints in *Jackson,* this Court stated:

"Checkpoint agents may stop and query motorists about their citizenship, and also request production of documents evidencing a right to be in the United States. Moreover, checkpoint agents may selectively refer motorists to secondary inspection areas for additional questioning without articulating any reason for doing so.... In practice, brief detentions at checkpoints increase agents' ability to identify illegal aliens by affording them a greater opportunity to scrutinize individual vehicles and their occupants, and thereby develop probable cause or obtain *consent* to support a search." *Jackson,* 825 F.2d at 862 (emphasis added) (citations omitted) (involving a permanent checkpoint stop).

Although Muniz–Melchor was ultimately detained for over two hours as the agents inspected the truck and its tank, Gutierrez

9. The determination whether law enforcement officers had probable cause to conduct a warrantless search involves a mixed question of law and fact. As noted, we defer to the purely factual findings of the district court unless they are clearly erroneous. *See Maldonado,* 735 F.2d at 814. Accepting those facts, however, the ultimate determination as to probable cause for a warrantless search seems to be a question of law for this Court to decide. *See Potter v. United States,* 362 F.2d 493, 494 (5th Cir.1966) ("Whether there was probable cause for any particular search without a warrant is always a judicial question...."); *cf. United States v. Bowles,* 625 F.2d 526, 533 n. 7 (5th Cir.1980) (reasonableness of seizure under Fourth

Amendment is a conclusion of law). Thus, we assume that we review *de novo* the district court's determination whether the facts properly found by it (or assumed to be so found) constitute probable cause. *Cf. United States v. McConney,* 728 F.2d 1195, 1199–1205 & n. 4 (9th Cir.) (en banc) (holding that the determination as to exigent circumstances for a warrantless search is a question of law reviewed *de novo* and stating that "[p]robable cause and exigent circumstances implicate very similar standard of review concerns"), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). *See generally* 2 S. Childress & M. Davis, *Standards of Review: Federal Criminal Cases and Administrative Appeals* § 11.1 at 104 (1986).

testified that he initially requested and received Muniz–Melchor's consent to the search only minutes after Muniz–Melchor stopped at the checkpoint. In light of the lawfulness and routine and limited nature of the initial checkpoint stop when Muniz–Melchor gave consent to Gutierrez, the district court specifically found that Muniz–Melchor was not then in custody.

Muniz–Melchor emphasizes that as many as six Border Patrol and DEA agents, some of whom were visibly armed, were present at the checkpoint, whereas Muniz–Melchor was alone. Even Muniz–Melchor's summary of the facts, however, reveals that at most three Border Patrol agents were present when Gutierrez initially requested Muniz–Melchor's consent to inspect his truck. Moreover, the record reflects that only Gutierrez was present at that time in the immediate vicinity of Muniz–Melchor's truck and that the other two agents came to Gutierrez's assistance only after Muniz–Melchor gave his consent.[10]

Gutierrez specifically testified as to Muniz–Melchor's cooperation with the Border Patrol agents' inspection of his truck. For example, Gutierrez testified that Muniz–Melchor stepped out of the cab of the truck when Gutierrez asked for permission to inspect it. When Gutierrez asked Muniz–Melchor about moving it to the secondary inspection area, Muniz–Melchor reentered the truck to do so, and when he was unable to restart it he permitted the agents to push it to the secondary area.

Gutierrez conceded that he did not inform Muniz–Melchor of his right to refuse consent when he requested Muniz–Melchor's permission to inspect the truck. Although this is "a critical factor in any voluntariness analysis," *Gonzales*, 842 F.2d at 755, this Court has stated that "[t]he giving of *Miranda* warnings prior to such a [consent-based checkpoint] search is not required, nor did [the defendant] have to be told that he had the right to refuse to consent." *Sutton*, 850 F.2d at 1085 (cita-

tions omitted) (involving a permanent checkpoint stop).

Muniz–Melchor suggests that we infer he was not well-educated in light of his Mexican origin and his inability to speak English. Although the inability to speak English is relevant to the analysis, the record below reveals nothing as to Muniz–Melchor's education or intelligence. If anything, it may be inferred from defense counsel's failure to question Muniz–Melchor in this respect that such matters would not be materially helpful to Muniz–Melchor's involuntariness claim. *Cf. United States v. Charles*, 738 F.2d 686, 698 (5th Cir.1984).

Muniz–Melchor contends there was no showing that he believed no incriminating evidence would be found. Gutierrez testified at trial that, when he informed Muniz–Melchor that they had called for the assistance of DEA agents, Muniz–Melchor replied that, if there was something in there, the agents must prove it, but that there was nothing in there. This testimony at best ambiguously supports Muniz–Melchor's contention. Indeed, Gutierrez testified that, after the DEA agents discovered the marihuana and when Gutierrez was reading Muniz–Melchor his *Miranda* rights, Muniz–Melchor exclaimed, "They put it in there." And, the government correctly emphasizes that, even if Muniz–Melchor should have realized that consent would not be in his best interests, such a circumstance is clearly not controlling on the ultimate issue of voluntariness. *See United States v. Galberth*, 846 F.2d 983, 988 (5th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 167, 102 L.Ed.2d 137 (1988). Moreover, Muniz–Melchor's below-referenced testimony supports the inference that when he gave consent to Gutierrez he then believed it likely nothing would be discovered.

Finally, Muniz–Melchor simply contends, contrary to Gutierrez's testimony at trial, that he did not consent to any request for inspection of his truck or its tank. How-

---

**10.** Muniz–Melchor also emphasizes that Gutierrez failed to request Muniz–Melchor's written consent. However, Gutierrez testified that he did not do so simply because he did not have any consent forms with him at that time.

ever, when questioned as to whether he did so consent, Muniz–Melchor testified, "No. Only as they search everyone, just around like that. Not so they would open everything and stuff." Indeed, Gutierrez and the Border Patrol agents' search, unlike that of Kelly and the DEA agents, primarily involved visual inspection. Viewing the totality of the evidence with due regard to the district court's opportunity to judge the credibility of the witnesses, *see Coburn,* 876 F.2d at 374, we find that the trial court was not clearly erroneous in determining that Muniz–Melchor voluntarily consented to the search by Gutierrez. From this and the other circumstances, probable cause developed for the subsequent search conducted by Kelly, as noted above.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

GOLDBERG, Circuit Judge, dissenting:

In my day, tap dancing was an art form. Much to my chagrin, however, the border patrol agent's tapping in this case is not as edifying. By constitutionalizing this activity, the majority has, in effect, chosen to tap dance over fourth amendment concerns. Yet even the most reluctant ears would agree that the constitution's tintinnabulations invite a different step. Dutiful to this harmony, I respectfully dissent.

Under Supreme Court precedent, a search occurs when the state infringes upon an expectation of privacy that society considers reasonable.[1] The government in-

fringes upon expectations of privacy when its actions might reveal information about an item other than the presence of contraband, even though the appearance of the item itself does not suggest contraband, despite exigent circumstances. *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

In *Place,* the Court held that exposure of luggage to a trained canine to determine whether the luggage contained contraband did not constitute a search under the fourth amendment.[2] In reaching this holding, the Court stated that:

A "canine sniff" by a well-trained narcotics detection dog, however, *does not expose noncontraband items that otherwise would remain hidden from public view,* as does, for example, an officer's rummaging through the contents of luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff *discloses only the presence or absence of narcotics, a contraband item.* Thus despite the fact that the sniff tells the authorities something about the contents of the luggage, *the information obtained is limited.*[3]

In *Jacobsen,* employees of a private shipping company accidently broke open a

---

1. *New York v. Class,* 475 U.S. 106, 112, 106 S.Ct. 960, 965, 89 L.Ed.2d 81 (1986); *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); *Smith v. Maryland,* 442 U.S. 735, 739, 99 S.Ct. 2577, 2579, 61 L.Ed.2d 220 (1979); *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). In *Rakas,* the Court stated that:

Legitimation of expectations of privacy by law must have a source outside of the fourth amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others ... and one who owns or lawfully possesses or controls property will in all likelihood have a

legitimate expectation of privacy by virtue of this right to exclude. Expectations of privacy protected by the fourth amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such an interest.... But by focusing on legitimate expectations of privacy in fourth amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of privacy interests protected by that Amendment.

*Id.*

2. *Place,* 462 U.S. at 707, 103 S.Ct. at 2644.

3. *Id.*

package.[4] Noticing a white powdery substance, they called a federal agent who removed a trace of the powder and determined that it was cocaine.[5] In holding that the agent's examination of the powder was not a search, the Court commented on the above quoted passage from *Place*.

> Respondents attempt to distinguish *Place*, arguing that it involved no physical invasion of Place's effects, unlike the conduct at issue here. However, as the quotation makes clear, the reason this did not intrude upon any legitimate privacy interest was that *the governmental conduct could reveal nothing about the noncontraband items*. That rationale is fully applicable here.[6]

*Place* and *Jacobsen* thus stand for the proposition that a search takes place when governmental action might reveal information about a noncontraband item even though the appearance of the item itself does not suggest the presence of contraband. *Hicks* further developed this idea.

In *Hicks*, the police searched the defendant's apartment after learning that a bullet had been shot through the floor.[7] The officers searched for suspects, victims, and weapons.[8] Suspicious that the defendant had stolen the stereo in his apartment, one of the officers recorded the stereo's serial numbers.[9] The officer found the numbers by moving the equipment.[10] The serial numbers proved that the equipment was stolen and the defendant was consequently indicted for robbery.[11]

The state argued that the officer's actions did not constitute a search. The Supreme Court disagreed reasoning that:

> [o]fficer Nelson's moving of the equipment, however, did constitute a "search" separate and apart from the search for the shooter, victim, and weapons that was the lawful objective of his entry into the apartment. Merely inspecting those parts of the turntable that come into view during the latter search would not have constituted an independent search, because it would have produced no additional invasion of respondent's privacy interest.... But taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry.... It matters not that the search uncovered nothing of any great personal value to the respondent.... A search is a search, even if it discloses nothing but the bottom of a turntable.[12]

*Hicks* reflects the importance of the information revealed by the item searched. The luggage in *Place* and the powder in *Jacobsen* each suggested the presence of contraband. Unlike the homogeneous powder in *Jacobsen*, or the smell emanating from the marijuana in *Place*, however, the contents of the stereo in *Hicks*, its serial number for example, could not be determined from its appearance.[13] And, perhaps more impor-

---

4. *Jacobsen,* 466 U.S. at 111, 104 S.Ct. at 1655.

5. *Id.*

6. *Id.* 466 U.S. at 124 n. 24, 104 S.Ct. at 1662 n. 24 (emphasis added).

7. *Hicks,* 107 S.Ct. at 1152.

8. *Id.*

9. *Id.*

10. *Id.*

11. *Id.*

12. *Id.*

13. *See also Arkansas v. Sanders,* 442 U.S. 753, 764 n. 13, 99 S.Ct. 2586, 2593 n. 13, 61 L.Ed.2d 235 (1979) (emphasis added):

> Not all containers and packages found by police during the course of a search will deserve the full protection of the fourth amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because *their contents can be inferred from their outward appearance.* Similarly, in some cases the contents of a package will be open to "plain view," thereby obviating the need for a warrant.... There will be difficulties in determining which parcels taken from an automobile require a warrant for their search and which do not. Our decision in this case means only that a warrant generally is required before personal luggage can be searched and that the extent to which the fourth amendment applies to containers and other parcels depends not at

tantly, *Hicks* instructs that even in the face of exigent circumstances, the state may not further invade privacy interests. Thus according to this trilogy of cases, the state infringes upon expectations of privacy when its actions might reveal information about an item other than the presence of contraband, even though the item itself does not appear to contain contraband, despite face of exigent circumstances.

Under this trilogy, the agent searched Melchor's tank when he tapped it. The majority states that the "purpose of Gutierrez's [the agents] tapping on the side of the tank was to determine the structural integrity of its exterior—*i.e.*, whether the tank's exterior had been penetrated in some manner." Yet it is difficult to understand the agent's concern with the tank's exterior unless the agent desired information about the tank's contents. The echo of the tap could reveal the presence of items other than contraband. If Melchor had "penetrated" the exterior of the tank, he could have hidden numerous non-contraband item from public view. Acquiring information about noncontraband items contravenes both *Place* where the Court stated that the sniff could only disclose the presence of

contraband[14] and *Jacobsen* where "the governmental conduct could reveal nothing about the noncontraband items."[15] Under the language of *Hicks*, moreover, not only was the tapping "unrelated to the objective of authorized intrusion"[16] i.e. the border search, but also the appearance of the tank, like the turntable's in *Hicks*, did not suggest the presence of contraband. The agent's tap thus constituted a search under the fourth amendment because it might have revealed the presence of non-contraband items and the exterior of the tank did not itself suggest the existence of contraband.

The majority also argues that there are relatively diminished expectations of privacy in automobiles. At 1435, citing *United States v. Chadwick, Cardwell v. Lewis*, and *South Dakota v. Opperman*.[17] Based on these cases, the majority then concludes that the threshold of what constitutes a search is relatively lower for automobiles than in other places. This conclusion is a non sequitur. In *Chadwick* and *Lewis*, the government had probable cause to conduct a search.[18] In *Opperman*, the police searched a car under an inventory proce-

all whether they are seized from an automobile.

Of course, this rationale explains the result in *New York v. Class*, 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986). In *Class*, the Court held that there is no reasonable expectation of privacy in vehicle inspection numbers. In arriving at this holding, the Court reasoned that vehicle inspection numbers play an important role in government regulation and that federal law required them to be visible to an observer outside of the car. *Id.* at 114, 106 S.Ct. at 966. "The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a "search." *Id.* at 114, 106 S.Ct. at 966. To state this point in the terms of the language of *Sanders*, everything ascertainable from a vehicle inspection number can be gleaned from its appearance. *Class* thus does not resolve the present case where the contents of a propane tank are hidden from public view. *See also United States v. Sylvester*, 848 F.2d 520, 525 (5th Cir.1988) ("[A] container cannot be opened unless its contents are in plain view or they can be inferred from the container's outward appearance. . . . A photographer's camera bag often contains items associated with taking pictures: film, lens cloth, extra lenses, collapsible tripod, etc. One could not say, however, that because items found in the bag usually are

not of an especially private type, the owner of the bag has no expectation of privacy in it. One simply cannot infer what is in the camera bag from its outward appearance." As such, the panel held that the owner had a reasonable expectation of privacy implicating fourth amendment protection.).

14. *Place*, 462 U.S. at 707, 103 S.Ct. at 2644.

15. *Jacobsen*, 466 U.S. at 111, 104 S.Ct. at 1655.

16. *Hicks*, 107 S.Ct. at 1152.

17. 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

18. *Chadwick*, 433 U.S. at 3, 97 S.Ct. at 2479 ("whether a search warrant is required before federal agents may open a locked footlocker which they have lawfully seized at the time of the arrest of its owners, when there is probable cause to believe the footlocker contains contraband"); *Cardwell*, 417 U.S. at 592, 94 S.Ct. at 2470 ("Under circumstances such as these, where probable cause exists, a warrantless examination of the exterior of the car is not unreasonable . . .").

dure after they impounded it.[19] I address the significance of each of these points in turn.

Concerning probable cause, in *United States v. Ross*[20] the Court held that "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." In reaching this holding, the Court discussed its decision in *Carroll v. United States.*[21] The *Carroll* Court held that a warrantless search of an automobile stopped by police officers who had probable cause to believe the vehicle contained contraband was not unreasonable under the fourth amendment.[22] Regarding *Carroll*, the Court in *Ross* stated:

> [s]ince its earliest days Congress had recognized the impracticability of securing a warrant in cases involving the transportation of contraband goods. It is this impracticability, viewed in historical perspective, that provided the basis of the *Carroll* decision. Given the nature of the automobile in transit, the Court recognized that an immediate intrusion is necessary if police officers are to secure the illicit substance.... In short, the exception to the warrant requirement established in *Carroll*—the scope of which we consider in this case—applies *only to searches of vehicles that are supported by probable cause.* In this class of cases, a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained.... Warrantless searches of automobiles have been upheld in a variety of factual contexts quite different

from that presented in *Carroll.* Cf. *Cooper v. California,* 386 U.S. 58 [87 S.Ct. 788, 17 L.Ed.2d 730] ... *Cady v. Dombrowski,* 413 U.S. 433 [93 S.Ct. 2523, 37 L.Ed.2d 706] ... *South Dakota v. Opperman,* 428 U.S. 364 [96 S.Ct. 3092, 49 L.Ed.2d 1000].... Many of these searches do not require a showing of probable cause that the vehicle contains contraband.[23]

*Ross* demonstrates that the mobility of automobiles was significant in creating an exception to the warrant requirement. Mobility, however, becomes a concern only when the government first has probable cause to suspect the presence of contraband. Without probable cause, the loss of the contraband through the movement of the automobile is not an issue. There is nothing to suspect. Automobile search cases predicated on probable cause are thus irrelevant to the analysis of the present case. In the present case, the inquiry is whether there was a search which in turn could create an interest that the automobile might vanish with contraband. Consequently, *Chadwick* and *Lewis,* cited by the majority, do not advance the analysis of whether there should be a diminished expectation of privacy in automobiles which would lower the threshold of what constitutes a search.

The majority's use of *Opperman,* a case involving a search after the police impounded a car, is similarly misplaced. The *Opperman* Court stated that the mobility of automobiles was not the only reason why it permitted the warrantless searches of automobiles in some circumstances.[24] The Court explained that:

---

19. *Opperman,* 428 U.S. at 369, 96 S.Ct. at 3097 ("When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents.").

20. 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

21. 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

22. *Ross,* 456 U.S. at 799, 102 S.Ct. at 2159.

23. *Id.* at 806–809, 102 S.Ct. at 2163–2164. In *Cooper v. California,* the police searched a car after they impounded it under the direction of a state statute. *Cooper,* 386 U.S. at 60, 87 S.Ct. at 790. Similarly in *Cady,* the police searched a car after it had been in an accident and was abandoned by its driver. *Cady,* 413 U.S. at 436, 93 S.Ct. at 2525.

24. *Opperman,* 428 U.S. at 367, 96 S.Ct. at 3096; *Arkansas v. Sanders,* 442 U.S. 753, 761, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979) ("There are essentially two reasons for the distinction between automobiles and other private property.

[b]esides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office. In discharging their varied responsibilities for ensuring the public safety, law enforcement officials are necessarily brought in frequent contact with automobiles.... Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements.[25]

This rationale for diminishing expectations of privacy in an automobile is also inapplicable to the present case. The agents stopped Melchor purportedly to protect the government's interest in preventing illegal immigration. The government created the border checkpoint where the agents stopped Melchor to guard this very interest. However "when the only government interest asserted is illegal immigration, the scope of border area searches must be limited to compartments large enough to secure a person."[26] Yet no reasonable person could believe that any human being would be lodged in a propane tank. Perhaps my knowledge of anatomy and the characteristics of propane tanks are foreign, but from my experience, I cannot believe that anyone would seek human breath in the echos of a tap. Our court is not concerned with the immigration of lilliputians. And fourth amendment safeguards should not be miniturized because of the drug problems in this country.[27]

First, as the Court repeatedly has recognized, the inherent mobility of automobiles often makes it impracticable to obtain a warrant.... In addition the configuration, use and regulation of automobiles often may dilute the reasonable expectation of privacy that exists with respect to differently situated property.")

25. *Id.* 428 U.S. at 368, 96 S.Ct. at 3097.

26. *United States v. Jackson,* 825 F.2d 853, 865 (5th Cir.1987) (en banc).

27. The majority also cites *United States v. Lopez,* 777 F.2d 543, 547 (10th Cir.1985) for the proposition that "the law does not require the police to ignore evidence of other crimes in conducting legitimate roadblocks...." The problem, however, is that the border agents in this case were not aware of any "other crimes" until *after* they made the initial search. But the constitutionality of this search is the issue to be decided. The majority has thus placed the cart before the horse in attempting to justify the search by the contraband that it revealed.