**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Rocky Wayne HILL,**
**Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Lewis Sanford PEMBERTON, aka Peck**
**Pemberton, Defendant–Appellant.**

**Nos. 87–1662, 87–1775.**

United States Court of Appeals,
Tenth Circuit.

Aug. 11, 1988.

Stephen J. Greubel (David Booth, Federal Public Defender, Tulsa, Okl., on the briefs), Asst. Federal Public Defender, Tulsa, Okl., for defendant-appellant Rocky Wayne Hill.

Frank R. Courbois, Oklahoma City, Okl., for defendant-appellant Lewis Sanford Pemberton.

Sheldon J. Sperling (Roger Hilfiger, U.S. Atty., with him on the briefs), Asst. U.S. Atty., Muskogee, Okl., for plaintiff-appellee.

Before ANDERSON and TACHA, Circuit Judges, and BRATTON, District Judge.*

TACHA, Circuit Judge.

Defendants Rocky Hill and Lewis ("Peck") Pemberton were indicted on drug charges. They filed separate motions to suppress evidence obtained as a result of their arrests and during searches of the houseboat they were operating. The district court denied both motions in a single order, and both Hill and Pemberton appeal. We affirm.

In January 1987 Rande Matteson, an agent for the Drug Enforcement Agency (DEA), investigated several reports from Mid–America Chemical Company (Mid–America) concerning the purchase of chemicals used in the production of drugs. On one occasion a man using the name Mike Shelton purchased chemicals used to manufacture amphetamine. The man drove a red car with a Louisiana tag; the car was thought to be a Ford Escort. A few days later a man who identified himself as Sam Harris picked up chemicals of the same nature. This man drove a red Ford LTD with the license plate number D1334. Agent Matteson traced the license plate number to a car dealership in Oklahoma City and spoke to the sales manager there. The sales manager told Matteson that he had loaned the LTD to defendant Pemberton forty-five minutes before the chemicals were purchased. He also told Matteson

that Pemberton owned a white Ford Bronco.

A third purchase of chemicals occurred two weeks later. On this occasion a man phoned Mid–America requesting ether and hydrochloric acid, both of which are used to manufacture methamphetamine. Later that afternoon a secretary at Mid–America called Agent Matteson to tell him a woman who wanted to buy the same chemicals was present in the store. The secretary said the woman smelled of phenylacetic acid and was driving a red Ford Escort with Louisiana license plates.

Agent Matteson drove to Mid–America and began surveillance of the red car. He followed the woman who drove it to the shore of Lake Texoma. The woman parked near a white Ford Bronco.

Matteson stopped the woman, who was later identified as Anita Riley. Riley agreed to cooperate. She said that her boyfriend, Peck, and someone named Rocky were on a boat. She also said they were armed. Riley told DEA Agent Lawrence Beck, who was also present at the lake, that flashing the car lights would draw the boat to shore. However, no boat responded to the signal.

Matteson testified at the suppression hearing that when he told Riley he believed she was involved in manufacturing drugs, Riley "made some statement to the effect, well, you already know." He also said that he removed a case of ether and a case of hydrocholoric acid from the trunk of the car she was driving. Riley refused to answer questions about the boat because she said she did not want to say anything against her boyfriend.

After questioning Riley, Matteson contacted the Oklahoma Bureau of Investigation. The Bureau contacted Oklahoma Highway Patrol Officer Bill Lambert, who lives in the Lake Texoma area. Lambert and another officer joined the DEA agents at the lake. Lambert told the agents that late in the afternoon he had seen an off-white, forty-foot houseboat leave a marina.

* Honorable Howard C. Bratton, United States District Judge for the District of New Mexico, sitting by designation.

He thought it was unusual for a houseboat to go out in "very cold weather." He testified that he did not see or hear any other boats on the lake that afternoon or night. Lambert said the boat he saw sounded like it had a twin screw motor.

Throughout the night the law enforcement officers kept a boat on the lake under continuous surveillance from shore. At times they could hear the engines of a boat that sounded as if it had a twin screw motor. At points they could see a houseboat that sounded the same as the one they heard. The officers noticed an orange glow, which intensified and diminished, emitting from inside the boat. Agent Matteson testified that an orange glow was consistent with the production of amphetamine.

Early the next morning the officers lost visual contact with the boat. They also learned that storm warnings had been issued for the lake. They therefore decided to board the boat, and they obtained a lake patrol boat for this purpose. After traveling out into the lake, the officers could see the same houseboat they had seen during the night and that Officer Lambert had seen the previous afternoon. The agents announced themselves and, after no response, boarded the houseboat. They arrested Hill and Pemberton, who were on board. The officers made a cursory search for other occupants. They found an operating amphetamine laboratory. Because of the volatility of the chemicals used, the officers turned off the electricity to the boat and ventilated it. They then took the boat to shore and secured it. Later they obtained a search warrant and searched the boat. They found drugs and equipment used to manufacture drugs.

Hill and Pemberton argue that their arrests were unlawful because of the lack of both probable cause and exigent circumstances. They argue that because their arrests were unlawful, the cursory search the officers conducted was not a valid search incident to an arrest. They also assert that evidence derived from the search pursuant to the warrant should be suppressed as fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Each of the arguments hinges on the validity of the arrests. Our determination on that issue is therefore dispositive in this case.

■ Before deciding whether the arrests were valid, we must address the government's contention that defendant Hill lacks standing to challenge the admissibility of evidence obtained from the houseboat. The government argues that, because Hill did not own the boat, he had no reasonable expectation of privacy in it. We hold that no showing of a privacy interest is necessary under the facts of this case. The main thrust of Hill's argument is that his warrantless arrest violated the fourth amendment and that all evidence obtained as a result of the arrest is therefore tainted and must be suppressed. Hill clearly may challenge the validity of his own arrest. We hold that he may therefore claim that evidence found as a fruit of the arrest should be excluded. *United States v. Williams*, 589 F.2d 210, 214 (5th Cir.1979) ("If a stop is unconstitutional, evidence found as a fruit of the unconstitutional stop may be excluded from evidence."), *aff'd en banc*, 617 F.2d 1063 (1980); *State v. Epperson*, 237 Kan. 707, 703 P.2d 761, 770 (1985) ("Many cases have held that a passenger has standing to challenge a search of a motor vehicle, where the motor vehicle and its passengers were improperly stopped."). Thus we proceed to consider whether the evidence must be suppressed.

The arrests here were valid only if "at the moment the arrest[s] [were] made, the officers had probable cause to make [them]." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). The officers had probable cause if "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendants] had committed or [were] committing an offense." *Id.*

■ We hold that the officers here had probable cause to arrest Hill and Pemberton. The officers followed a car, which

twice had been involved in the purchase of chemicals used to manufacture drugs, to the shore of Lake Texoma. Riley parked the car next to a white Ford Bronco. The officers knew that the white Bronco was owned by the same person who borrowed the LTD used to purchase chemicals. In addition Riley, who was apparently delivering chemicals to someone, told the officers that Peck and Rocky were on a boat and that they were armed. It was unusual for a boat to be out at night in the middle of winter. Finally, the officers observed the boat and saw it emitting an orange glow. We hold that these facts are sufficient to warrant a prudent person in believing that the defendants were committing a crime. Therefore, probable cause existed when the officers announced their presence.

■ The defendants argue that while the officers may have had probable cause to believe drugs were being manufactured on board a boat on the lake, they did not have probable cause to believe that the boat they stopped was the right one. However, Officer Lambert testified that before the boat was stopped, he recognized it as the same boat he had seen leaving the marina the previous afternoon and emitting an orange glow during the night. Furthermore, it was unusual for *any* boats to be on the lake at night during such cold weather. At no point did the officers either hear or see any other vessel. Finally, the officers had reason to believe that the boat they sought would be in the general area in which Riley parked since Riley had told them the boat would respond to a visual signal from shore. We hold that in these circumstances a reasonably prudent person would be warranted in believing that drugs were being manufactured on the houseboat the officers stopped.

■ In addition to having probable cause, police must obtain a warrant before making a "nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Payton v. New York*, 445 U.S. 573, 576, 100 S.Ct. 1371, 1375, 63 L.Ed. 2d 639 (1980). A warrant would therefore be required in this case if the houseboat constitutes a home for the purposes of *Payton.*

■ Neither the Supreme Court nor the courts of appeal have decided whether *Payton* requires officers to obtain an arrest warrant before entering a houseboat to effectuate an arrest. We are guided, however, by the cases dealing with searches of motor vehicles. *Payton*, 445 U.S. at 585–90, 100 S.Ct. at 1379–82 (applying the analyses of cases involving seizures of property to the arrest context). A search of premises entails a greater invasion than an entry for purposes of effectuating an arrest. *Jones v. Denver*, 854 F.2d 1206, 1209–10 (10th Cir.1988). If the police could have constitutionally boarded the houseboat to search it without a warrant, then no warrant was necessary to board the boat in order to arrest Hill and Pemberton.

In *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), the Supreme Court held that police did not need a warrant in order to enter a mobile home parked in a public place. The motor home was capable of functioning as a home; it was stationary; and the shades were drawn, including one across the front window. Indeed the Court observed that the motor home "possessed some, if not many of the attributes of a home." *Id.* at 393, 105 S.Ct. at 2070. Nevertheless, the Court held that it is "clear that the vehicle falls clearly within the scope" of the vehicle exception to the warrant requirement. *Id.* The Court relied on "two requirements for application of the [vehicle] exception." *Id.* at 394, 105 S.Ct. at 2071. First is "the ready mobility of the vehicle," and second is its "presence in a setting that objectively indicates that the vehicle is being used for transportation." *Id.* Even though the mobile home in *Carney* was parked and not being used for transportation at the moment, it satisfied the second test presumably because it was not located in a place "regularly used for residential purposes—temporary or otherwise." *Id.* at 392, 105 S.Ct. at 2070. The Court held that "the vehicle was so situated that an objective observer would conclude that it was being

used not as a residence, but as a vehicle." *Id.* at 393, 105 S.Ct. at 2070.

 Although *Carney* involved a motor home and we deal here with a houseboat, the two vehicles are similar. Both are of the "hybrid character" that place them "at the crossroads between the privacy interests that generally forbid warrantless invasions of the home and the law enforcement interests that support the exception for warrantless searches of automobiles based on probable cause." *Id.* at 395, 105 S.Ct. at 2071 (Stevens, J. dissenting) (citations omitted). Both a houseboat and a motor home are readily capable of functioning as both vehicle and home. The Supreme Court has considered the tension created by this dual nature, and we are bound by its determination. We hold that *Carney* controls the disposition of this case.

The houseboat here was obviously readily mobile and therefore satisfies the first *Carney* requirement. Indeed, the officers had observed it traveling up and down the lake during much of the night. Furthermore, Lake Texoma is a large lake, and the boat's occupants could have easily eluded the officers. The second *Carney* requirement is also satisfied. Given the Supreme Court's determination in *Carney*, we cannot say that the boat in this case was present in a setting that objectively indicated it was being used as a residence. We are persuaded that an objective observer would conclude that a moving boat navigating the waters of a large lake on a cold winter night was not being used as a residence. We therefore hold that the houseboat falls within the vehicle exception. Thus, because the houseboat could have been searched without a warrant, the rule of *Payton* requiring a warrant for an arrest in a suspect's home is inapplicable here. Since no warrant was required, an arrest based solely on probable cause was valid, and we need not address the defendants' contention that exigent circumstances were lacking.

Defendants argue that the cursory search made at the time of their arrest was invalid because the officers had no lawful right to be on the boat. We have already held that the arrests were valid and therefore uphold the cursory inspection as a valid search incident to arrest.

Finally, defendants argue that the fruits of the search conducted pursuant to the warrant should be suppressed because illegally obtained evidence was used to obtain the warrant. Since both the arrest and cursory search were valid, this argument fails as well.

AFFIRMED.