**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Jerry Wayne ERVIN,**
**Defendant–Appellee.**

**No. 89–1673.**

United States Court of Appeals,
Fifth Circuit.

July 26, 1990.

LeRoy Morgan Jahn, Asst. U.S. Atty., Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for plaintiff-appellant.

Thomas H. Hirsch, Odessa, Tex., for defendant-appellee.

Before THORNBERRY, GEE and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

After being indicted for possession of more than 100 kilograms of marijuana with intent to distribute, Jerry Wayne Ervin moved to 'suppress the marijuana, seized during a search of his trailer. The district court held that the defendant did not consent to the search and that the search did not fall within an exception to the search warrant requirement imposed by the Fourth Amendment. Finding, however, that the search fell within the automobile exception to that requirement, we REVERSE.

### I.

On August 5, 1988, United States Border Patrol Agent Burns inspected a camp site at Chimney Trails, located along the Rio Grande in Big Bend National Park.[1] He observed tracks of four or more horses and a motor vehicle and trailer, interspersed with footprints. Based on his training and experience, Burns determined that a meeting had taken place the previous night.[2] He "followed these tracks back and found they were coming from the village of Santa Elena, Chihuahua, Mexico, which is directly opposite the ranger station at Castolon, [Texas,] in the Big Bend National Park."[3] He noted that a horse and rider could easily make this six-mile trip undetected. Burns "conclu[ded] that the horses were packing in contraband and they were putting them in vehicles which met them there [at the Chimney Trails site]." Consequently, he established a surveillance point at the intersection of two roads near the site.

Approximately three weeks later, on the evening of August 25, Burns went to the surveillance point. He first "drove over the mouth of the driveway that goes into the Chimney camp site so that [if] a vehicle . . . entered or left after that [time, it] would drive over the top of my car tracks." At 10:00 p.m., he observed a pickup truck pulling "a small travel trailer . . . [which] had an air conditioner mounted on the top" approach Chimney Trails. At 11:00 p.m., Burns called Border Patrol Agent McRae for assistance, because Burns had received a call requiring him to investigate suspicious activity at the border. McRae arrived about 30 minutes later, and Burns "explained fully to [McRae] what [Burns] had seen . . . [and] suspected." Burns then left.

At approximately 12:05 a.m., McRae observed "a white travel trailer [with] an air conditioner on top," leave Chimney Trails. The travel trailer matched the description that Burns had given him and was the only vehicle that he saw at the site. McRae

---

1. Burns testified: "We [Border Patrol Agents] . . . had on several occasions seen tracks of horses coming up to this campsite, and apparently meeting a vehicle and presumably unloading something from the horses onto the vehicle. This always happened at night. We never saw the vehicle. The people who came into the campsite were never registered with the Park Service to occupy that campsite."

2. Burns testified that the tracks had been made "the previous night, judging from the tracks, that four horses had come up to this campsite

or within a few yards of it, that a vehicle had come into the campsite which was a vehicle that we figured was the size of a standard pickup; that this vehicle was pulling a single axle trailer and there was a lot of tracks back and forth between where the horses were and where the trailer and vehicle were.... We took pictures of what we saw there."

3. Burns had received training in "cutting sign," the tracking of animals and vehicles, as "a routine part of the job is to cut sign and follow tracks."

reported to Burns, and Burns informed him that he was returning to meet McRae.

McRae followed the pickup and trailer until it stopped at the Big Bend Motor Inn Motel in Study Butte, a community outside of the park. McRae approached the truck, which contained Ervin and his wife. McRae asked the driver, Ervin, for permission to look into the vehicle and trailer; and Ervin assented. After McRae looked through the pickup, Ervin opened the door of the trailer. McRae "gave a cursory glance" inside but detected no contraband. McRae testified that "being by myself I could not really turn my back on anybody, especially at night. So I did not search it very thoroughly...." In response to McRae's questions, Ervin stated that he had seen no other vehicles or horses at the park; and that because his wife felt ill and their trailer air conditioning did not work, they had decided to sleep in the motel. McRae observed that Ervin's wife appeared ill. McRae concluded the questioning; and, after watching the Ervins check into the motel, McRae left.

In the interim, Burns returned to the Chimney Trails site to check the tire tracks. Although the tracks of the vehicle pulling the trailer did not appear to be the same as those he had observed on August 5, the trailer tire tracks "looked to be identical to those that [Burns] had seen" then. He also observed that the vehicle pulling the trailer had dual wheels. He also noted numerous fresh horse tracks, as well as fresh footprints. He could "tell that there were a group of horses ... probably four or more," and that the hoof prints were the "same age as those vehicle tracks...." Burns radioed McRae about his findings and drove to the motel.

McRae was returning to the surveillance point when he received Burns' call that "the dual wheel vehicle pulling the trailer, had met some horses at Chimney Trails campground." McRae returned to the motel; and, after the manager told him which room the Ervins occupied, he "knocked on the door and ... they invited me in." McRae told Ervin "there seemed to be a little discrepancy in what he [Ervin] told me earlier and what we had found on sign." McRae asked Ervin to wait outside with him until Burns arrived.

Burns arrived at 1:10 a.m. and began questioning Ervin. Burns testified that Ervin stated that he had "gone down to [Chimney Trails] ... about midnight," and that in driving away from the site, he passed by another vehicle, an El Camino, coming from the opposite direction. Burns testified that Ervin's trailer "looked like the one that I had seen turning in [earlier at the Chimney Trails and that] ... the wheels on both the truck and the trailer ... looked like the ones that I had just seen at Chimney campsite." Burns advised Ervin of his rights and testified that he said "we would like to look in your trailer, do we have permission.... [and Ervin] said yes." Burns and McRae walked in the trailer and "knew something was wrong ... [because] the distance was too small between my head and the trailer." Burns and McRae continued searching, without success, with the assistance of other agents who had arrived.

Burns testified that "at this time Mr. Ervin was sitting in the backseat of the patrol car. He called me over and said he wanted to talk, and he said it is in the floor." Burns asked Ervin how to get it, and Ervin explained that they would have to take up the carpet and offered a screwdriver. Subsequently, the agents found 470 pounds of marijuana in the floor of the trailer. The agents had neither obtained, nor tried to obtain, a search warrant.

Defendant Ervin was indicted with possessing more than 100 kilograms of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Upon Ervin's motion, the district court suppressed the marijuana found in the search. After hearing testimony, the court ruled that the "Defendant did not consent to the search and that the Border Patrol Agents searched the trailer without a search warrant or an applicable exception to the search warrant requirement. The search was conducted in violation of the Fourth Amendment." The

government timely appealed.[4]

## II.

The government contends that the search was constitutional because (1) there was probable cause for the search, and (2) Ervin's trailer came under the automobile exception to the search warrant requirement.

In reviewing the grant of a motion to suppress, "the trial court's purely factual findings must be accepted unless clearly erroneous, or influenced by an incorrect view of the law...." *United States v. Muniz–Melchor,* 894 F.2d 1430, 1433–34 (5th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 1957, 109 L.Ed.2d 319 (1990) (quoting *United States v. Maldonado,* 735 F.2d 809, 814 (5th Cir.1984)). The evidence is viewed in the light most favorable to the prevailing party. *United States v. Reed,* 882 F.2d 147, 149 (5th Cir.1989); *United States v. Lanford,* 838 F.2d 1351, 1354 (5th Cir. 1988). Of course, we freely review questions of law. *Muniz–Melchor,* 894 F.2d at 1433.

### A.

█ We turn first to whether the trailer fell under the automobile exception. The Fourth Amendment expressly protects against *"unreasonable* searches and seizures...." (Emphasis added.) And in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Court held:

> [T]he true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid.

*Id.* at 149, 45 S.Ct. at 283. The Court justified the automobile exception on the grounds that

> the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

*Id.* at 153, 45 S.Ct. at 285. Historically, "individuals always [have] been on notice that movable vessels may be stopped and searched on facts giving rise to probable cause that the vehicle contains contraband, without the protection afforded by a magistrate's prior evaluation of those facts." *California v. Carney,* 471 U.S. 386, 392, 105 S.Ct. 2066, 2069, 85 L.Ed.2d 406 (1985), (*citing United States v. Ross,* 456 U.S. 798, 806, n. 8, 102 S.Ct. 2157, 2163, n. 8, 72 L.Ed.2d 572 (1982)).

The Court has "consistently recognized *ready* mobility as one of the principal bases of the automobile exception." *Carney,* 471 U.S. at 390, 105 S.Ct. at 2068 (emphasis added):

> However, although ready mobility alone was perhaps the original justification for the vehicle exception, our later cases have made clear that ready mobility is not the only basis for the exception. The reasons for the vehicle exception, we have said are twofold. (citation omitted) "Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." [5]

---

**4.** 18 U.S.C. § 3731 authorizes the government to appeal "from a decision or order of a district courts suppressing or excluding evidence ... if the United States Attorney certifies to the district court that the appeal is not taken for the purpose of delay and that the evidence is a

substantial proof of fact material in the proceeding." The United States Attorney made the requisite certification.

**5.** The Court has noted that "[a]utomobiles, unlike homes, are subject to pervasive and continuing government regulation and controls, in-

*Carney,* 471 U.S. at 391, 105 S.Ct. at 2069 (*citing South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976)). "Even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily-mobile vehicle justified application of the vehicular exception." *Carney,* 471 U.S. at 391, 105 S.Ct. at 2069. "In this class of cases, the [Carroll] Court held that a warrantless search of an automobile is not unreasonable." *United States v. Ross,* 456 U.S. 798, 809, 102 S.Ct. 2157, 2164, 72 L.Ed.2d 572 (1982).

As the district court held, the critical issue in this case is not whether there was probable cause for the search (as discussed *infra,* we find that there was), but whether the trailer was more like a house or automobile for purposes of the Fourth Amendment. The Supreme Court has held that the warrantless search of a mobile home was within the automobile exception to the warrant requirement. *Carney,* 471 U.S. at 393, 105 S.Ct. at 2070.

In *Carney,* a Drug Enforcement Administration agent had information that the defendant's mobile home was being used to exchange marijuana for sex. The mobile home was parked in a lot in downtown San Diego; it was stationary; and its shades were drawn. The Court noted that it "possessed some if not many of the attributes of a home...." *Id.* at 393, 105 S.Ct. at 2070. The agent requested that a youth, who had just left the mobile home, return and knock on the door. When the defendant stepped out, the agent, without a warrant or consent, entered the mobile home and observed marijuana.

The Supreme Court held that the search did not violate the Fourth Amendment; that "the vehicle was so situated that an objective observer would conclude that it was being used not as a residence, but as a vehicle." *Id.* at 393, 105 S.Ct. at 2070. The Court relied on "two requirements for application of the [vehicle] exception": first, "the ready mobility of the vehicle"; and second, its "presence in a setting that objectively indicates the vehicle is being used for transportation." *Id.* at 394, 105 S.Ct. at 2070.

The Court rejected the defendant's argument that his vehicle should be distinguished because it was capable of functioning as a home:

> To distinguish between respondent's motor home and an ordinary sedan for purposes of the vehicle exception would require that we apply the exception depending upon the size of the vehicle and the quality of its appointments. Moreover, to fail to apply the exception to vehicles such as the motor home ignores the fact that a motor home lends itself easily to use as an instrument of illicit drug traffic and other illegal activity.

*Id.* at 393–94, 105 S.Ct. at 2070.[6]

Ervin's trailer falls squarely under *Carney:* (1) it was not parked in a place regularly used for residential purposes but in a motel parking lot; (2) Ervin and his wife were not occupying the trailer as a home; and (3) it was readily mobile. Moreover, the district court's ruling that Ervin had an expectation of privacy is contradicted by

---

cluding periodic inspection and licensing requirements." *Opperman,* 428 U.S. at 368, 96 S.Ct. at 3096. The Court noted that police stop and examine vehicles as "an everyday occurrence." *Id.; see also Michigan Dept. of State Police v. Sitz,* —— U.S. ——, 110 S.Ct. 2481, 2488, 110 L.Ed.2d 412 (1990) (Court upheld sobriety checkpoint).

**6.** Other Circuits have followed the reasoning in *Carney. See, e.g. United States v. Tartaglia,* 864 F.2d 837, 841 (D.C.Cir.1989) (automobile exception applied, no heightened expectation of privacy in a train roomette); *United States v. Markham,* 844 F.2d 366, 368–69 (6th Cir.), *cert. de-*

*nied,* 488 U.S. 843, 109 S.Ct. 116, 102 L.Ed.2d 90 (1988) (a warrant-less search supported by probable cause of an unattended motor home parked in a private driveway did not violate the Fourth Amendment); *United States v. Hill,* 855 F.2d 664, 667–68 (10th Cir.1988) (warrantless search of a houseboat allowed because it was readily mobile and not in a setting that objectively indicated that it was being used for a residence); *United States v. Hamilton,* 792 F.2d 837, 843 (9th Cir.1986) (the search of the motor home fell within the scope of the vehicle exception even though it was located in a residential driveway and was attached to utilities by an extension cord).

the Ervins' not using the trailer as a home, nor was there any evidence that it was being used as a camper. Therefore, under *Carney*, the automobile exception to the warrant requirement applies to the search of Ervin's trailer.

## B.

We turn now to the issue of probable cause; for, of course, the automobile exception is applicable only if "the overriding standard of probable cause is met." *Carney*, 471 U.S. at 392, 105 S.Ct. at 2069.[7]

### 1.

■ We agree with the district court that "[w]hen Agent McRae stopped Ervin for the first time as Ervin was exiting the vehicle at the Motel, he had specific, articulable facts upon which to base his suspicions." The district court found:

> The Government had every right to be suspicious of that trailer, particularly in view of the fact that they were told that it didn't meet anybody, in view of the fact that according to the tracks, at least the trailer had been down there and met the horses. *The only issue that we have got is whether or not the Government should have obtained a search warrant on that trailer ....* (Emphasis added.)

A border patrol agent conducting a roving patrol in a border area may make a temporary investigative stop of a vehicle if aware of "specific articulable facts, together with the rational inferences from those facts, that reasonably warrants suspicion" that the vehicle is engaged in illegal activities. *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975).

■ In assessing reasonable suspicion, a court is to examine "the totality of the circumstances, including the 'collective knowledge' of all officers...." *United States v. Muniz–Ortega*, 858 F.2d 258, 260 (5th Cir.1988), *citing United States v. Kohler*, 836 F.2d 885, 888 (5th Cir.1988). Some of the factors that can be considered include the characteristics of the area, the proximity to the border, traffic patterns, the agent's previous experience with criminal traffic, the type and appearance of the vehicle, and the driver's behavior. *Brignoni–Ponce*, 422 U.S. at 884–85, 95 S.Ct. at 2581–82. "While any single factor in isolation would be insufficient to support the stop, we consider the reasonableness of the officer's suspicion under 'the totality of the particular circumstances.'" *Kohler*, 836 F.2d at 888–89 (*citing Brignoni–Ponce*, 422 U.S. at 885, n. 10, 95 S.Ct. at 2582, n. 10).

■ Here, the collective facts known to the agents were more than sufficient to support the stop, including: (1) the pattern of tracks observed at Chimney Trail site over the past few months; (2) the proximity of those tracks and the border; (3) the tracing of those tracks to a Mexican town; (4) the likelihood that smuggling activities were being carried on at the site; (5) the late hour at which Ervin had driven into the area and his short stay there; (6) the pattern of travel, as well as Ervin's tire tracks matching those of the vehicles that were believed to have been loaded at the site on August 25 and one of the vehicles on August 5; and (7) Ervin's vehicles were ideal for smuggling activities. Therefore, we find that the record amply supports the court's finding of reasonable suspicion.

### 2.

■ The question is whether that reasonable suspicion rises to a level of proba-

---

7. As the district court found, McRae's earlier encounters with the Ervins did not violate the Fourth Amendment. Neither the first stop and search by McRae nor the second contact at the motel "tainted" the subsequent search. As to the initial search, the district court found that "Ervin consented to the search ... [and] the circumstances of the request to search the vehicle were such that the consent was voluntarily given and did not offend the Fourth Amend-

ment." The second encounter, which occurred when McRae knocked on the motel room door, does not trigger Fourth Amendment scrutiny for Ervin responded voluntarily. *United States v. Mason*, 661 F.2d 45, 47 (5th Cir.1981); *see United States v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976) (person standing in the threshold of doorway to residence is in a "public place").

ble cause. *See United States v. Espinoza–Seanez*, 862 F.2d 526, 533 (5th Cir.1988) (citing *United States v. Martinez*, 808 F.2d 1050, 1055 (5th Cir.) *cert. denied*, 481 U.S. 1032, 107 S.Ct. 1962, 95 L.Ed.2d 533 (1987). The standard of reasonable suspicion, is "a less demanding standard than probable cause...." *Alabama v. White*, — U.S. —, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990); *United States v. Espinoza–Seanez*, 862 F.2d 526, 533 (5th Cir.1988). A finding of probable cause involves "a practical common-sense decision whether ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Muniz–Melchor*, 894 F.2d at 1438 (citations omitted); *See, e.g., White*, 110 S.Ct. at 2416 (citing *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332). Probable cause determinations are a "laminated total" and are predicated upon what border patrol agents "have heard, what they know, and what they have observed as trained officers." *Espinoza–Seanez*, 862 F.2d at 532 (citations omitted).[8]

The reasonable suspicion that the agents had for the initial stop was fortified by Burns' additional evidence of the meeting of horses and vehicles at Chimney Trails, the matching of the tires on Ervin's vehicle to the tracks found at the camp site, and Ervin's false explanations of his activities and whereabouts. The total of all these observations and events, when viewed in light of the agents' experience, established more than a fair probability that Ervin's trailer contained contraband. *Illinois v. Gates*, 462 U.S. 213, 230–31, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983); *United States v. Mendoza*, 722 F.2d 96, 100–02 (5th Cir.1983). "If there was not already probable cause for search of the [trailer] ..., these facts, combined with the reasonable suspicion the agents already had, strength-

ened that suspicion into probable cause." *Espinoza–Seanez*, 862 F.2d at 533.

Accordingly, the district court erred in holding that Ervin's trailer could not be searched without a warrant. Consequently, the fruits of the search are admissible. *United States v. Sutton*, 850 F.2d 1083, 1085 (5th Cir.1988) (warrantless searches of vehicles would be reasonable if based on consent or probable cause).[9]

### III.

Accordingly, the district court's order suppressing the evidence found in the search of Ervin's trailer is

REVERSED and this case is REMANDED for proceedings consistent with this opinion.

---

8. "The determination whether law enforcement officers had probable cause to conduct a warrantless search involves a mixed question of law and fact." *Muniz–Melchor*, 894 F.2d at 1439 n. 9. We are bound by the findings of a district court unless clearly erroneous, "however, the ultimate determination as to probable cause for a warrantless search seems to be a question of law for this Court to decide." *Id.*

9. The district court found that "[t]he [second] search of the vehicle could not be considered to be performed with the 'voluntary consent' of Ervin under these circumstances." As discussed above, the agents had probable cause. Consequently, this court need not reach the issue of whether the district court erred in concluding that Ervin's consent to search was involuntary.