STATE of Wisconsin, Plaintiff-Respondent,

v.

Scott A. DURBIN, Defendant-Appellant.

Court of Appeals

*No. 91-2860-CR. Submitted on briefs June 9, 1992.—Decided August 4, 1992.*

(Also reported in 489 N.W.2d 655.)

475

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Keith A. Findley,* assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the briefs of *James E. Doyle,* attorney general, and *Maureen McGlynn Flanagan,* assistant attorney general.

Before Cane, P.J., LaRocque and Myse, JJ.

MYSE, J.   Scott Durbin appeals a judgment convicting him of two counts of felony possession of stolen property, contrary to sec. 943.34(1)(b), Stats., with the second count charged as a· repeater under sec. 939.62, Stats. Durbin contends that the warrantless search of his camper trailer parked in the yard behind his apartment violated his right to freedom from unreasonable searches and seizures under the fourth amendment to the United States Constitution. He argues that the trial court erred by holding that the camper trailer, which was not attached to a vehicle for towing, falls within the "automobile exception" to the fourth amendment's warrant requirement. Durbin appeals the court's denial of his motion to suppress evidence obtained from the initial search of the trailer and subsequent searches of Durbin's trailer, truck and apartment. Durbin argues that the sub-

sequent searches and seizures were fruits of the initial unlawful search of his trailer. Because we agree that the initial warrantless search of Durbin's trailer was unlawful and because whether the initial illegal search tainted the subsequent searches requires factual findings, we reverse the judgment of conviction and remand the cause with instructions.

In the morning of August 29, 1990, Green Bay Police Officer Kenneth Gehm was dispatched to Durbin's residence, part of a duplex, to deliver a long distance telephone message. Durbin was not at home at the time, so Gehm left a written message in the back door of Durbin's residence. Later, at approximately 12:30, Gehm responded to a report that Geraldine Hejduk believed she had found stolen property in Durbin's camper trailer that was parked in the yard behind his residence. When Gehm arrived, Hejduk informed him that she was Durbin's friend and had been checking the wiring in the camper trailer. The camper trailer was approximately twenty feet long, with wheels and a ball socket that could be hooked up to a ball hitch on a vehicle for towing. At the time, Durbin was elsewhere with his truck, and the camper trailer was not attached to a towing hitch. Hejduk told Gehm that she did not own the camper, but she had a key and took Gehm inside. Once inside the camper, Hejduk showed Gehm five bricks of lottery tickets sealed in cellophane, with the name of an Oconto Phillips 66 station stamped on them, hidden under a cushion. Hejduk and others residing in the duplex informed Gehm that they had seen a large number of prerecorded video cassettes and a large amount of cash in Durbin's apartment, and that they had seen Durbin carrying a gun.

After searching Durbin's camper, Gehm took the lottery tickets into his possession for safe keeping. He

479

then contacted the Wisconsin Lottery Office in Green Bay and determined that the lottery tickets had been issued to a Phillips 66 station in Oconto County, but had not been reported stolen. Gehm then contacted Oconto County Sheriff's Department Investigator Dale Janus. Janus informed him that the Phillips 66 station had recently been burglarized and was missing lottery tickets. Janus then contacted Durbin's parole officer, Tom Frewerd, and told Frewerd about the lottery tickets found in Durbin's camper and the possibility that Durbin had been carrying a gun. Frewerd authorized a parole hold on Durbin and contacted his supervisor to get permission to search Durbin's residence for stolen property and a firearm. When Frewerd and Janus arrived at the Green Bay police station, they were informed that Durbin had returned to the residence and had been taken into custody for questioning at approximately 2:30 that afternoon.

After Durbin had been read his *Miranda* rights, he agreed to give a statement to the Green Bay police. Durbin admitted that there was a gun in his truck and that there were lottery tickets in his camper, but claimed that someone else had put them there. This information was relayed to Frewerd, and he requested assistance from police officers in conducting the search of Durbin's residence.

Frewerd, Janus and several Green Bay police officers then went to Durbin's residence. They arrived at approximately 4:30 p.m. and spoke with Hejduk and Diane Kolosso, Durbin's girlfriend who resided with him. Frewerd and the officers first searched Durbin's truck and retrieved a pistol from underneath the seat and some ammunition from inside the glove compartment. Next, they searched Durbin's camper and retrieved bolt cutters and a pair of gloves. Finally, they

searched Durbin's apartment and retrieved tools, prerecorded video cassettes, a video cassette recorder and other stolen goods. Frewerd and the police officers then went to the Green Bay police station. After learning of Kolosso's statement to Janus indicating that additional items in Durbin's apartment had been stolen, Frewerd, Gehm and another officer returned to Durbin's apartment to retrieve the additional items. All of these searches were conducted without a warrant, and based on Frewerd's authority as Durbin's parole officer.

Durbin was charged with four burglaries and four related thefts in separate criminal complaints that were consolidated before the trial court. None of these charges related to the stolen lottery tickets seized from Durbin's camper; rather, all were based on the stolen property seized from Durbin's apartment. Prior to the consolidation, Durbin moved the court to suppress

> all statements he made to the police and all physical evidence in the possession and control of the prosecution pursuant to a warrantless search of [Durbin's] residence at 509 South Ashland, Green Bay, Brown County, Wisconsin, and any and all leads, tangible, or otherwise, derived directly or indirectly from the evidence sought to be suppressed.

At the hearing on Durbin's motion to suppress, there was some discussion regarding the legality of the initial search of Durbin's camper. The trial court found that Hejduk lacked authority to consent to the search of Durbin's camper. The trial court further ruled that the initial search of the camper was not unlawful, because it came within the automobile exception to the fourth amendment's warrant requirement. Following the state's motion to consolidate, Durbin filed motions to suppress identical to the earlier motions. The trial court refused

to rehear the motions because they were barred by collateral estoppel.

Shortly before the scheduled trial on the consolidated charges, Durbin entered into a plea agreement with the state. In exchange for Durbin's guilty plea to an amended information charging him with two counts of receiving stolen property, the state agreed to dismiss with prejudice the other charges against him. Durbin pled guilty and was convicted of two counts of felony possession of stolen property, with the second count charged as a repeater. The trial court sentenced him to ten years in prison.

## LAWFULNESS OF INITIAL CAMPER TRAILER SEARCH

The state has specifically waived the issue of whether the fourth amendment protects Durbin's camper trailer parked in the yard behind the duplex in which Durbin resides. The state was given an opportunity to address this issue and conceded that the camper trailer was protected. Therefore, we need not address this issue. *State ex rel. WED v. Joint Committee for Review of Admin. Rules,* 73 Wis. 2d 234, 236, 243 N.W.2d 497, 498 (1976).

However, a trial court's application of constitutional principles to the facts of a case is subject to independent appellate review. *State v. Seyferth,* 134 Wis. 2d 354, 358, 397 N.W.2d 666, 668 (Ct. App. 1986). Durbin argues that his camper trailer was not a "vehicle" subject to the automobile exception established in *Carroll v. United States,* 267 U.S. 132, 149, 153–54 (1925), and adopted in Wisconsin in *State v. Tompkins,* 144 Wis. 2d 116, 136–37, 423 N.W.2d 823, 832 (1988). The state contends

that this issue was not litigated at the trial court level, and thus is not properly presented on appeal. We note, however, that the trial court determined on its own motion that the camper search was valid based on the automobile exception. The state also contends that the issue of the legality of the initial camper search cannot be resolved on the present record, and requests a remand to allow it to "complete" the record concerning the mobility and other characteristics of the camper. We conclude that further evidence is not necessary to resolve the issue of the legality of the initial camper search.

The fourth amendment's warrant requirement is intended to protect persons from unreasonable government intrusion and is "subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). The automobile exception created in *Carroll* was originally designed to account for the exigent circumstances created by the inherent mobility of automobiles. *South Dakota v. Opperman,* 428 U.S. 366, 367 (1976); *Carroll,* 267 U.S. at 153–54. Subsequent Supreme Court decisions recognized that there are two justifications for the automobile exception: (1) ready mobility and (2) persons have a lesser expectation of privacy in their automobiles than in their homes or offices. *California v. Carney,* 471 U.S. 386, 391 (1985). In Wisconsin, this diminished expectation of privacy has been justified by "the inherent mobility of automobiles, the periodic inspection and licensing requirements of automobiles, and the public nature of automobile travel where both its occupants and contents are in plain view." *State v. Weber,* 163 Wis. 2d 116, 138, 471 N.W.2d 187, 196 (1991).

The automobile exception has been applied to vehicles other than automobiles in Wisconsin and in the

federal courts. In *Carney,* the Supreme Court held that the search of a motor home parked in a public lot was within the automobile exception. *Id.* at 388. The Court reasoned that:

> When a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential pur-poses—temporary or otherwise—the two justifica-tions for the vehicle exception come into play. First, the vehicle is obviously readily mobile by the turn of an ignition key, if not actually moving. Second, there is a reduced expectation of privacy stemming from its use as a licensed motor vehicle subject to a range of police regulation inapplicable to a fixed dwelling.

*Id.* at 392-93. Our supreme court adopted this reasoning in *Tompkins,* 144 Wis. 2d at 129, 423 N.W.2d at 828. Additionally, the *Carney* Court noted that the mobile home was "so situated that an objective observer would conclude that it was being used not as a residence, but as a vehicle." *Id.* at 393.

The fifth circuit has also applied the automobile exception to camper trailers, similar to the one here. *United States v. Ervin,* 907 F.2d 1534 (5th Cir. 1990), involved a search of an unoccupied camper trailer that was hitched to a towing vehicle and parked in a motel parking lot. *Id.* at 1536, 1538. The court determined that the automobile exception applied to the camper trailer searches because they were (1) situated in nonresidential areas, (2) unoccupied, (3) readily mobile by virtue of being hitched to towing vehicles and (4) not being used as campers at the time of the search. *Id.* at 1538-39.

However, the issue of whether the automobile exception applies to an unhitched camper trailer that is parked in the back yard of the owner's residence is one of

first impression in Wisconsin. Neither the United States Supreme Court nor our own supreme court has extended the automobile exception to a situation like the one here, and we decline to do so.

First, the cases discussed previously are distinguishable from the present case. Unlike the mobile home in *Carney,* the camper trailer here is not itself readily mobile. It must first be hitched to an automobile capable of towing it. The camper trailer in *Ervin,* while itself not readily mobile, was hitched to a towing vehicle at the time it was searched. Here, the record shows that at the time of the search, Durbin's camper was not hitched to an automobile and, further, that Durbin and his truck were not at the residence until two hours after the search.

Second, there was evidence that Durbin's camper trailer was being used as a camper and not as a vehicle. It was parked in the back yard of the duplex Durbin lived in, which is not "a setting that objectively indicates that the vehicle is being used for transportation." *Carney,* 471 U.S. at 394.

Finally, the two justifications for the automobile exception announced by the Supreme Court in *Carney* and our supreme court in *Weber* are not applicable here. Durbin's camper was not "inherently mobile" or even "readily mobile" at the time it was searched. Additionally, exhibit 21 shows that the windows were quite small and had curtains in them. The camper did not have a windshield or other large windows allowing plain view of the camper's contents. Whatever expectation of privacy Durbin had in his camper, it was greater than in an automobile or a mobile home.

485

## LAWFULNESS OF SUBSEQUENT SEARCHES

The charges against Durbin relate to items discovered and seized during the subsequent searches; therefore, the lawfulness of the subsequent searches must be addressed. Although we have determined that the initial camper search was invalid, we cannot determine as a matter of law whether the illegal search of Durbin's camper tainted the subsequent searches of Durbin's truck, camper and apartment based on the present record. In spite of the unlawfulness of the initial search, the fruits of the subsequent searches may be admissible. The trial court did not address this issue because it determined that the initial camper search was valid. A hearing is necessary to determine the facts surrounding the subsequent searches to determine if they were tainted by the initial unlawful camper search. Therefore, we reverse the conviction and remand the cause to the trial court for a determination whether the fruits of the subsequent searches are admissible.

*By the Court.*—Judgment reversed and cause remanded with directions.