UNITED STATES of America

v.

William Bruce HARE, John Timothy
Majors and Tamorra Lynn
Pinkston.

Criminal Action No. 1:95CR174.

United States District Court,
E.D. Texas,
Beaumont Division.

May 3, 1996.

Joseph Batte, Assistant United States Attorney, Beaumont, TX, for plaintiff.

Thomas Burbank, Frank J. Maida & Associates, Beaumont, TX, for Hare.

James DeLee, Port Arthur, TX, for Majors.

Dan Cogdell, Boyd & Cogdell, Houston, TX, for Pinkston.

## MEMORANDUM OPINION

HEARTFIELD, District Judge.

### I. Background

On December 7, 1995, a grand jury indicted William Bruce Hare and John Timothy Majors, of charges to willfully and knowingly conspire, combine, confederate and agree together to distribute and possess with intent to distribute marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21 United States Code, Sec-

tion 846. The indictment also charged Hare and Majors individually of the same offense. Subsequently, on February 8, 1996, a Grand Jury issued a First Superseding Indictment joining defendant Tamorra Pinkston in the conspiracy charge and adding a charge against Pinkston in her individual capacity.

## II. Factual Findings

On November 16, 1995, narcotics investigators with the Texas Department of Public Safety (DPS) received information from two individuals that defendant, William Hare, and at least two others were involved in the sale of narcotics. DPS discovered this information through two individuals who were stopped by DPS troopers while the individuals were driving east on I–10. During the traffic stop, the DPS troopers discovered five pounds of marijuana in the automobile. The individuals agreed to cooperate with DPS investigators and reported that they bought the marijuana at the Houston residence of William Hare, 14217 Roundstone. In addition to Hare, the informants saw a woman named Tamorra and a man named Tim at the residence. The individuals also noticed marijuana, scales, saran wrap, and three firearms in the house that day. DPS narcotics investigator, Sergeant Jerry Moore, checked William Hare's FBI record and discovered seventeen entries.

Sergeant Moore immediately began an investigation of Hare and other individuals. With the assistance of DPS narcotics agents, the informants made recorded telephone calls to Hare for the purpose of setting up a drug purchase transaction. From the recorded calls, Sergeant Moore determined that Hare had in fact been the supplier of the five pounds of marijuana and was willing to supply the individuals with fifty more pounds of marijuana. Sergeant Moore obtained assistance from other law enforcement agencies and set up surveillance at the 14217 Roundstone, Houston residence. DPS Sergeant Richard Greer began surveillance on the Houston residence on Friday, November 17, 1995. He was assisted by eight to ten officers and one of the informants. On Saturday, November 18, 1995, approximately five officers performed light surveillance. On Sunday morning, November 19, 1995, Sergeant Greer alone watched the house. The surveillance unit observed defendants Hare and Majors entering and leaving the house several times, using pay phones, and entering and leaving the Pine Forest Jewelry Store with a small package. The officers also noted the color, model, and license plates of five cars parked at the residence which might be used in a drug transaction.

During the three days of surveillance, the informants continued contact with Hare to set up a drug purchase in Orange, Texas. At some point on Saturday or Sunday, it became apparent that the transaction in Orange might occur Sunday night, November 19, 1995. The informants' contacts with Hare and Pinkston during that weekend indicated that Hare was gathering the marijuana which was located at a jewelry store, packaging the marijuana, and making plans to go to Orange, Texas. In their conversations, Hare also offered to sell the informants cocaine and ecstasy. Finally, at about 4 p.m. on Sunday November 19, 1996, an informant notified Sergeant Moore that Hare and Pinkston had paged him and were on their way to Orange, Texas. Sergeant Moore contacted other law enforcement officers involved in the investigation to begin surveillance on I–10.

Deputy Gary Porter, aware of the facts surrounding the investigation, spotted two of the suspected automobiles on I–10 in Beaumont, Texas. He followed the white Dodge Intrepid and saw the car weave to the left out of its lane. He stopped the Dodge for failing to maintain a single lane of traffic, in violation of Texas traffic laws. The driver, Hare, who appeared more nervous than the average motorist, did not have a driver's license and identified himself as Randall Harrison. The passenger, Pinkston, did not have a driver's license with her but identified herself as Tamorra Pinkston. She also told Deputy Porter that the driver's name was Randall Harrison. Deputy Porter obtained verbal consent from Hare to search the car. During a search of the interior of the automobile, Deputy Porter recovered a Motorola two-way radio, fixed on a channel, and asked Pinkston who it belonged to. She stated that

the radio belonged to her father who must have left it in the car. In the trunk, Deputy Porter discovered papers which he recognized to be drug notes, typically kept by persons engaged in the sale of narcotics. Deputy Porter arrested Hare for failure to have a driver's license. Soon thereafter, Deputy Porter was contacted by other law enforcement officers who stopped Majors in the blue Buick on I–10 in Orange, Texas. They requested Deputy Porter to bring his drug dogs to the scene. Deputy Porter traveled to Orange, accompanied by Pinkston. Hare, who was under arrest, was brought in the car behind.

About the same time that Deputy Porter stopped the white Dodge Intrepid on I–10, Sergeant Greer in an unmarked car and DPS Trooper Young in a marked police car followed the blue Buick further up I–10 towards Vidor, Texas, heading to Orange. DPS Trooper Young stopped the Buick driven by Majors for failing to maintain a single lane of traffic after the car swerved onto the shoulder on the right side of the interstate, a violation of Texas traffic laws. The DPS Trooper checked Majors driver's license, insurance, and proof of ownership. When asked where he was going, Majors replied that he was headed to Louisiana to meet friends and do a little gambling. During a separate conversation with the female passenger, the officers were told that the pair was going to meet friends in Orange, Texas and would return to Houston that night. In addition to conflicting stories, Sergeant Greer and Trooper Young observer that Majors was extremely nervous and his voice was shaking. Trooper Young asked Majors if he would sign a consent form to search the Buick. Majors declined. Sergeant Greer called Deputy Porter, who was still questioning Hare and Pinkston further back on I–10, and asked him to bring his certified drug detection dogs. About ten minutes later, Deputy Porter arrived with his dogs. Deputy Porter used a dog, Allie, to walk around the Buick. The dog immediately became tense, with ears perked, and she began to scratch on the rear passenger side of the vehicle and the trunk. Sergeant Greer advised Majors that the dog was alerting for drugs and they had probable cause to search.

Majors hung his head and said, "You might as well get your hand cuffs out." The trunk contained two cardboard boxes. When asked if he knew what was in the boxes, Majors replied, "Y'all know what's in the boxes." The officers found approximately fifty pounds of marijuana and Majors was arrested.

Pursuant to the arrest, the officers searched the interior of the Buick. They found a Motorola two-way radio and a plastic bag with approximately 200 tablets of a narcotic (MDMA) 3, 4 Methylenedioxy Methamphetamine, also called ecstasy. At that point the law enforcement agents arrested Pinkston. All the suspects were taken to the DPS office. The three defendants received Miranda warnings before arriving at the DPS office. Upon arrival at the DPS office, Sergeant Moore again Mirandized the suspects.

The following day, Monday November 20, 1995, Sergeant Moore presented an affidavit to a Harris County Magistrate Judge and obtained a search warrant for the 14217 Roundstone residence in Houston. The warrant permitted law enforcement agents to search for and seize (1) drugs kept, prepared or manufactured in violation of the laws of the state of Texas, (2) weapons prohibited by the penal code, and (3) any property the possession of which is prohibited by law, and (4) contraband subject to forfeiture under Chapter 59 of the Texas Code of Criminal Procedure, including but not limited to cash money. Among the items discovered during the search were: 6 lbs. of marijuana, ecstasy tablets, Valium, cocaine left on a large white platter, cocaine base residue on an instrument spoon, three scales, saran wrap, boxes of small and medium sized plastic zip lock baggies, $5,860 in United States currency, a Barretta 9mm semiautomatic handgun, boxes of shotgun shells and shell cartridges, receipts with alias names, and drug notes similar to the ones found in Hare's car.

Hare and Pinkston move to suppress evidence obtained in the November 19, 1995 warrantless search of the white Dodge Intrepid and the November 20, 1995 search of their Houston residence, pursuant to a war-

rant. Mr. Majors moves to suppress evidence obtained in the warrantless search of the blue Buick.

## III. Conclusions of Law

### A. Traffic Stop and Search of the White Dodge Intrepid

Hare and Pinkston move to suppress the evidence obtained during the November 19, 1995 stop and search of the rented white Dodge Intrepid. Both defendants argue that the car was improperly stopped for a pretextual reason to search the car without a warrant. Although Hare consented to a search of the Dodge, he claims that consent was invalid and even if valid, the search exceeded the scope of consent.

■ A routine traffic stop is analyzed under the two step process introduced in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). First, the court must determine the reasonableness of the search or seizure by asking whether the officer's action was justified at its inception. Second, the court examines whether or not the officer's actions during the stop were "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879; *United States v. Zucco*, 71 F.3d 188, 189–91.

■ The court finds that the initial stop of the Dodge was justified. Under Texas law, a driver should drive as nearly as practical entirely within a single lane and shall not move from such lane until the driver has ascertained that such movement can be made with safety. Tex.Rev.Civ.Stat.Ann. art. 6701d § 60(a). Therefore, Deputy Porter justifiably stopped Hare and Pinkston when he observed them veering in and out of traffic. Consequently, the traffic stop satisfies the first prong of the *Terry* test.

Defendants argue that the traffic stop was a pretext to enable the officers to search for narcotics, and therefore unreasonable. The Fifth Circuit foreclosed this argument: "[S]o long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry." *United States v. Causey*, 834 F.2d 1179, 1184 (5th Cir.1987) (en banc). Here, Deputy Porter was legally permitted to stop a car veering out of its lane of traffic. The fact that Deputy Porter was looking for drugs is irrelevant. Furthermore, Deputy Porter could have stopped the car even if the driver had not committed a traffic violation. Based on the corroborated informant's information, he had reasonable suspicion that criminal activity was afoot.

■ The court finds that the scope of the stop was permissible. In a traffic stop, an officer can request a driver's license, insurance papers, vehicle registration, run a computer check and issue a citation. *Zucco*, 71 F.3d at 190–92. Since Hare did not have his driver's license, Deputy Porter asked for his name. In addition to appearing nervous, Hare gave the deputy a false name, Randall Harrison. Pinkston also told the deputy that Hare's name was Randall Harrison. However, Deputy Porter recognized Hare from a previous photo. Deputy Porter properly checked the information that Hare and Pinkston provided. When the deputy recognized Hare, knew that Hare was lying about his name, and suspected criminal activity, he properly continued to question the suspects. Therefore, the scope of the stop was appropriate and the second prong of the *Terry* test has been met.

■ Hare also contests the validity of the search. This court makes two separate inquiries in analyzing an individual's consent to search: (1) whether the consent was voluntary and (2) whether the search was within the scope of the consent.

■ Six factors guide this court's determination of whether the consent to search was voluntary. They include the defendant's custodial status, education and intelligence, extent of cooperation, awareness of his right to refuse consent, and belief that no incriminating evidence would be found, together with the presence of coercive police procedures. *United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir.1993). All of these factors are relevant; no single factor is dispositive. In this case, Hare was not free to leave without further check of his driver's license.

However, he objectively believed that he would be released when the officer finished checking the names and license number. Hare was cooperative during the stop and there is no evidence of antagonism. Deputy Porter did not employ any coercive or deceptive tactics to procure his consent. Although the record is silent on Hare's education, the court finds that he did understand the consent given. It is unclear whether Hare believed that incriminating evidence would be found during the search. Considering the factors as a whole, the court finds that Hare's consent to search was voluntary.

■■■■ In the alternative, Hare maintains that if consent was valid, the search was conducted beyond the scope of consent given. The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness-what the typically reasonable person would have understood by the exchange between the officer and the suspect. *Florida v. Jimeno,* 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). In *Jimeno,* the court found that general consent to search the car included consent to search containers within the car that might contain drugs; the authorization went beyond the surfaces of the car's interior to the paper bag on the car's floor. *Id.* Under this test, it is clear that the roadside search did not exceed the scope of Hare's consent where the deputy obtained general permission to search the car. A reasonable person could have understood this to mean the interior of the car and the trunk.

## B. Traffic Stop and Search of the Blue Buick

Majors moves to suppress the evidence seized during the traffic stop and search of the blue Buick automobile. He argues that the car was improperly stopped for a pretextual reason of searching the car without a warrant. He objects to the search on the ground that law enforcement officers lacked probable cause to search.

For the reasons that the traffic stop of Hare and Pinkston was proper, the court upholds the validity of Officer Young's traffic stop of Majors. Therefore, the two prong test in *Terry v. Ohio* has been met.

■■■■ Next, Majors contests the search of his automobile, conducted after a dog sniff. A dog sniff is not a search within the meaning of the Fourth Amendment. *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *United States v. Hernandez,* 976 F.2d 929 (5th Cir.1992). Officers do not need reasonable suspicion of drug-related criminal activity as a prerequisite to a dog sniff. *United States v. Goldstein,* 635 F.2d 356 (5th Cir.), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981). The only prerequisite is that a dog sniff be employed during a lawful seizure of the vehicle. Once the dog alerts officers of drugs in any part of the vehicle, officers have probable cause to conduct a search.

In this case, the vehicle was lawfully stopped pursuant to a traffic violation. At the time the vehicle was stopped Sergeant Greely had reasonable suspicion that criminal activity was in progress. In support of his suspicions, Majors seemed extremely nervous and he and the passenger gave conflicting stories. The officers were justified in calling a drug dog. While they waited approximately ten minutes, the officers did not subject Majors to any intrusion or restraint beyond that necessary for investigation. He was not physically restrained. The vehicle was not searched or impounded until after the drug dog arrived. When the dog approached the Buick, she immediately became tense, with ears perked, and began to scratch on the rear passenger side of the vehicle and trunk. The dog alert gave the officers probable cause to open the trunk of the vehicle. The court finds that based on the dog alert Sergeant Greely and Officer Young had probable cause to open the trunk of the Buick to search for narcotics.

■■■■■ When the marijuana was discovered in the trunk, the officers arrested Majors. Once an individual is arrested, the police may search the automobile incident to arrest. The scope of the search extends to the passenger compartment and any containers in the passenger compartment. *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). Although the purpose of the search under Belton is to sweep

the area in which the suspect might reach to grab a weapon or destroy evidence, the holding of Belton applies even if the suspect is handcuffed behind the car. *Id; see Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).[1] Therefore, the search of the interior was proper along with the discovery of the ecstasy tablets and the two-way radio.

## C. Reasonable Suspicion and Probable Cause Based on Informants' Tips

▮▮▮ The traffic stops of both automobiles was proper. However, this court finds that the officers could have stopped both cars regardless of any traffic violations. In certain situations an informant's tip, whether anonymous not, if corroborated by independent police investigation, may give rise to reasonable suspicion that the suspect is engaged in criminal activity. *See Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Such a tip provides reasonable suspicion for an automobile stop. *Id.* The Supreme court has used the totality of the circumstances test- the whole picture standard in determining when reasonable suspicion exists. *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

Sergeant Moore received information from two informants concerning the involvement of defendants in narcotics distribution. He corroborate the information in several ways: (1) running an FBI check on a suspect, William Hare, (2) recording telephone conversations between the informant and a suspect in which the parties discussed a past drug transaction and a potential future drug transaction, and (3) conducting three days of surveillance on the suspects' house. Sergeant Greer received information from the informants on Sunday, November 19, 1995 that Hare and others were headed towards Orange, Texas to deliver marijuana. Surveillance on I–10 around Beaumont, Texas spotted two vehicles matching the description of automobiles which Hare had access to. The

totality of the circumstances provided reasonable suspicion that criminal activity was afoot. Therefore, regardless of a traffic violation, the officers has reasonable suspicion to stop Hare, Pinkston, and Majors.

▮▮▮ Although this court finds that the consent search of Hare's car and the search based on probable cause of Majors' car was proper, the court finds that pursuant to corroborated information from the informants, the officers had probable cause to conduct searches in both situations. Probable cause is necessary to conduct the search of an automobile. A probable cause determination involves "a practical common-sense decision whether ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Muniz–Melchor,* 894 F.2d 1430, 1430, (5th Cir.1990) *quoting United States v. Cisneros–Mireles,* 739 F.2d 1000, 1003 (5th Cir.1984), *quoting Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Probable cause requires only a probability or substantial chance of criminal activity but not a showing of such activity. *United States v. Mendez,* 27 F.3d 126, 129 (5th Cir.1994). The evidence presented in support of the probable cause determination must be viewed in light of the observations, knowledge, and training, of the law enforcement officers involved in the warrantless search. *Muniz–Melchor,* 894 F.2d at 1438. In making a probable cause determination, the searching officer is permitted to consider both the degree of the intrusion which the search will occasion and the law enforcement exigencies present in the particular situation.

In this case, law enforcement officials knew of a probability or substantial chance that defendants were traveling on I–10 towards Orange, Texas to sell fifty pounds of marijuana. The events that occurred during the stops further supported the officer's beliefs. The court finds that, regardless of Hare's consent and the drug dog's detection

---

**1.** Even if the holding in *Belton* were not as broad, the police would eventually have found the items in the interior of the car, after the inventory was conducted at the DPS office according to established police procedures. Thus the evidence would have been discovered through a wholly independent legitimate source. Under the inevitable discovery doctrine, the ecstasy tablets and the two-way radio would not be suppressed.

of contraband in Major's car, the officers had of probable cause to search both cars.

## D. Search Warrant

Hare and Pinkston move to suppress the evidence obtained during the November 20, 1995 warrant-based search of their Houston residence. Defendants first challenge the validity of the warrant, contending that the supporting affidavit is insufficient to provide probable cause. Second, defendants challenge the seizure of drug notes which were not named in the warrant.

▇ In reviewing the validity of a search warrant, the court must decide under the totality of the circumstances presented, whether the judicial officer has a substantial basis for finding fair probability that contraband, or other evidence of a crime, would be found in the place searched. *Gates,* 462 U.S. 213, 103 S.Ct. 2317. The court must evaluate if there is reasonable cause to believe that the specific things to be searched for are located on the property to which entry is sought. *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). Finally, the court must examine whether the magistrate performed his neutral and detached function on the facts before him and did not merely "rubber stamp" conclusions drawn by police. *United States v. Travisano,* 724 F.2d 341, 345 (2nd Cir.1983). When the warrant is issued, in part, pursuant to information from an informant, the magistrate must determine the reliability of the informant's tips using the totality of the circumstances test. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527. A judge may determine reliability by looking at police corroboration of the informant's facts. *See Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527.

▇ In this case, the affiant, Sergeant Moore, provides enough information for a magistrate to determine that probable cause existed that the contraband and other evidence would be found at Hare's and Pinkston's residence. Sergeant Moore received information from an informant. He corroborate the information by running an FBI check on Hare, recording telephone conversations discussing drug transactions, and conducting three days of surveillance on the suspects' house. This information led to the arrest of the two residents of the Houston residence in connection with a conspiracy to distribute narcotics. A reasonable magistrate could have found that the affiant provided sufficient evidence to establish probable cause to search the residence.

▇ Defendants also contest the validity of seizing the drug notes, which were not named in the search warrant. Under the Fourth Amendment, any warrant must particularly describe the place to be searched and the persons or things to be seized. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). However, an exception to the warrant requirement exists where the contraband, evidence of a crime, or instrumentality is observed in plain view by a law enforcement officer from a vantage point where he has a lawful right to be and where it is immediately apparent that the items are contraband or evidence of a crime. This is known as the plain view exception. *See Id.* Key to the determination of the validity of a warrantless seizure is that "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Additionally, the seized items must have an incriminating character that is immediately apparent to the searchers. *United States v. Hill,* 19 F.3d 984, 989 (5th Cir.1994) *cert. denied* — U.S. ——, 115 S.Ct. 320, 130 L.Ed.2d 281 (1994).

In this case, the searcher, Special Agent Larry Sanders of the ATF, was looking through a box in the master bedroom closet when he found the drug notes. He testified that he was looking between the papers in the box for contraband. This is consistent with the fact that other evidence was discovered in the closet. The court finds that Agent Sanders was properly looking for contraband in a place where it might be hidden, a box in the master bedroom closet. His presence in this location was justified by the scope of the warrant and did not violate the Fourth Amendment. Special Agent Sanders also testified that he immediately recognized

the papers as drug notes and evidence of a crime. The court finds that given his experience in narcotics investigations, Special Agent Sanders immediately identified the papers as evidence. Therefore, this court finds that all of the items were properly seized.

Accordingly, the court denies the three motions to suppress of defendants, William Hare, Timothy Majors, and Tamorra Pinkston.